No. 13-4057

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

UNITED TECHNOLOGIES CORPORATION,

Defendant-Appellant.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

———————————

**BRIEF FOR THE APPELLEE**

———————————

STUART F. DELERY
    *Assistant Attorney General*

CARTER M. STEWART
    *United States Attorney*

ALAN S. GALE
    *Attorney, Civil Division*

MICHAEL S. RAAB
BENJAMIN M. SHULTZ
    *(202) 514-3518*
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7211*
    *U.S. Department of Justice*
    *950 Pennsylvania Ave., N.W.*
    *Washington, D.C.  20530*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION ..................................................................2

STATEMENT OF THE ISSUES ........................................................................2

STATEMENT OF THE CASE............................................................................2

    A.    FACTUAL BACKGROUND ..........................................................2

        1.    The Engine Competition .......................................................2

        2.    Pratt's Proposals...................................................................4

        3.    Evaluation And Acceptance .................................................7

        4.    The Warranties ..................................................................10

        5.    The Improvements...............................................................11

    B.    PRIOR PROCEEDINGS................................................................15

        1.    The Board ..........................................................................15

        2.    The Current Lawsuit............................................................17

SUMMARY OF ARGUMENT..........................................................................24

STANDARD OF REVIEW ...............................................................................28

ARGUMENT......................................................................................................28

I.     THE DISTRICT COURT PROPERLY CALCULATED
       DAMAGES ................................................................................28

       A.     The District Court Precisely Followed This Court's
              Mandate ........................................................................28

       B.     Even In A More Ordinary Market, The District Court's
              Approach Would Have Been Correct ............................38

       C.     The District Court Properly Credited The Government's
              Expert ............................................................................41

       D.     The District Court Reasonably Accounted For Pratt's
              Warranties ....................................................................48

II.    ISSUE PRECLUSION DOES NOT APPLY ............................52

III.   PRATT WAS LIABLE FOR DAMAGES AND INTEREST
       UNDER THE COMMON LAW.................................................57

       A.     The Contract Did Not Preclude Claims For Unjust
              Enrichment Or Payment By Mistake............................57

       B.     The District Court Properly Awarded Prejudgment Interest....66

CONCLUSION ...................................................................................70

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS
UNDER 6TH CIR. RULE 30(g)(1)

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <u>Page</u>

*Bechtel v. Pension Benefit Guaranty Corp.,*
  781 F.2d 906 (D.C. Cir. 1985) ..............................................................60

*Bigelow v. RKO Radio Pictures,*
  327 U.S. 251 (1946) ................................................................... 25, 43

*Brown v. Crowley,*
  312 F.3d 782 (6th Cir. 2002).................................................... 46, 49

*Budget Mktg. v. Centronics Corp.,*
  927 F.2d 421 (8th Cir. 1991)................................................... 61, 63

*Budinich v. Becton Dickinson & Co.,*
  486 U.S. 196 (1988) ..............................................................................67

*Elyria-Lorain Broad. Co. v. Lorain Journal Co.,*
  358 F.2d 790 (6th Cir. 1966).................................................... 43, 44

*Estate of Kaplin v. Commissioner,*
  748 F.2d 1109 (6th Cir. 1984).................................................. 39, 49

*Eyerman v. Mary Kay Cosmetics, Inc.,*
  967 F.2d 213 (6th Cir. 1992)..............................................................64

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.,*
  766 F.2d 1007 (7th Cir. 1985).................................................. 62, 63

*Gross v. Commissioner,*
  272 F.3d 333 (6th Cir. 2001)..............................................................38

*Hammer v. INS,*
  195 F.3d 836 (6th Cir. 1999)..............................................................56

*Harry W. Applegate, Inc. v. Stature Elec., Inc.,*
  275 F.3d 486 (6th Cir. 2001)..............................................................61

*Heckler v. Community Health Servs. of Crawford County, Inc.,*
  467 U.S. 51 (1984) ..........................................................................65

*In re Electronic and Space Corp.,*
  1995 ASBCA LEXIS 171 (A.S.B.C.A. 1995) ....................................67

*In re North American Corp.,*
  1984 ASBCA LEXIS 603 (A.S.B.C.A. 1984) ....................................67

*In re United Technologies Corp.,*
  2004 ASBCA LEXIS 15 (A.S.B.C.A. Feb. 27, 2004)...............passim

*In re United Technologies Corp.,*
  2005 ASBCA LEXIS 10 (A.S.B.C.A. Jan. 19, 2005) ...............passim

*Klein v. Arkoma Prod. Co.,*
  73 F.3d 779 (8th Cir. 1996)........................................................ 61, 63

*McBride v. Boughton,*
  123 Cal. App. 4th 379 (Cal. Ct. App. 2004)....................................64

*Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
  134 S. Ct. 843 (2014) ......................................................................45

*Niecko v. Emro Mktng. Co.,*
  973 F.2d 1296 (6th Cir. 1992)..........................................................58

*Northrop Corp. v. McDonnell Douglas Corp.,*
  705 F.2d 1030 (9th Cir. 1983)..........................................................31

*Olchowik v. Sheet Metal Workers' Intl. Ass'n,*
  875 F.2d 555 (6th Cir. 1989)............................................................55

*Old Republic Ins. Co. v. Federal Crop Ins.,*
   Co., 947 F.2d 269 (7th Cir. 1991)........................................59

*Osterneck v. Ernst & Whinney,*
   489 U.S. 169 (1989) .........................................................68

*Peddinghaus v. Peddinghaus,*
   692 N.E.2d 1221 (Ill. App. Ct. 1998) ...............................65

*Pogor v. Makita U.S.A.,*
   135 F.3d 384 (6th Cir. 1998)............................................68

*Porter v. Hu,*
   169 P.3d 994 (Haw. Ct. App. 2007)..................................61

*Rock Island A & L. R. Co. v. United States,*
   254 U.S. 141 (1920) .........................................................65

*St. Mary's Honor Ctr. v. Hicks,*
   509 U.S. 502 (1993) .........................................................44

*Suburban Transfer Service, Inc. v. Beech Holdings, Inc.,*
   716 F.2d 220 (3d Cir. 1983)...................................... 61, 63

*T. Marzetti Co. v. Roskam Baking Co.,*
   680 F.3d 629 (6th Cir. 2012).............................................28

*Technicolor Motion Picture Corp. v. Westover,*
   202 F.2d 224 (9th Cir. 1953).............................................39

*Tennessee ex rel. Leech v. Doles,*
   749 F.2d 331 (6th Cir. 1984).............................................59

*United States ex rel. Compton v. Midwest Specialties, Inc.,*
   142 F.3d 296 (6th Cir. 1998).............................................33

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ..................................................................33

*United States ex rel. Miller v. Bill Harbert Intl. Contsr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010) ................................................44

*United States ex rel. Taxpayers Against Fraud v. Singer Co.*,
    889 F.2d 1327 (4th Cir. 1989)................................................43

*United States v. 0.376 Acres of Land*,
    838 F.2d 819 (6th Cir. 1988)..................................................39

*United States v. 103.38 Acres of Land*,
    660 F.2d 208 (6th Cir. 1981)....................................... 25, 38, 39

*United States v. 2635.04 Acres of Land*,
    336 F.2d 646 (6th Cir. 1964)..................................................40

*United States v. Applied Pharmacy Consultants, Inc.*,
    182 F.3d 603 (8th Cir. 1999)........................................... 60, 61

*United States v. Cartwright*,
    411 U.S. 546 (1973) ..................................................................29

*United States v. Commodities Trading Corp.*,
    339 U.S. 121 (1950) ......................................................... 24, 29

*United States v. Lahey Clinic Hosp., Inc.*,
    399 F.3d 1 (1st Cir. 2005) ......................................................59

*United States v. United Technologies Corp.*,
    626 F.3d 313 (6th Cir. 2010).........................................passim

*United States v. Warshawsky*,
    20 F.3d 204 (6th Cir. 1994)....................................................29

*United States v. Wurts,*
   303 U.S. 414 (1938) ...................................................................58

*Utility Audit, Inc. v. Horace Mann Serv. Corp.,*
   383 F.3d 683 (7th Cir. 2004).................................................. 62, 63

*Walgreen Co. v. Sara Creek Property Co.,*
   966 F.2d 273 (7th Cir. 1992)...................................................38

*West Virginia v. United States,*
   479 U.S. 305 (1987) ...............................................................68

*Whattoff v. United States,*
   355 F.2d 473 (8th Cir. 1966)...................................................40

*Wolfe v. Perry,*
   412 F.3d 707 (6th Cir. 2005)...................................................53

*Wright v. Holbrook,*
   794 F.2d 1152 (6th Cir. 1986).................................................59

*Wynne v. United Technologies Corp.,*
   463 F.3d 1261 (Fed. Cir. 2006)........................................... 17, 54

**Statutes:**

10 U.S.C. § 2306(f) (1982) ............................................................15

10 U.S.C. § 2306(f)(1) (1982) .......................................................15

10 U.S.C. § 2306(f)(2) (1982) ................................................. 57, 64

22 U.S.C. § 2761(a) (1982) ...........................................................31

22 U.S.C. § 2778 (1982) ...............................................................31

28 U.S.C. § 1291 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

28 U.S.C. § 1345 ........................................................................................ 2

31 U.S.C. § 3729(a) .................................................................................. 17

31 U.S.C. § 3731(c)(2006) ....................................................................... 45

41 U.S.C. § 605(a) (1982) ........................................................................ 68

Department of Defense Authorization Act, 1985,
    Pub. L. No. 98-525, § 103(b), 98 Stat. 2492, 2502 (1984) ................ 10

Pub. L. No. 97-377, § 797, 69 Stat. 1830, 1865 (1982) ........................... 9

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .......................................................................... 2

Fed. R. App. P. 28(a)(8)(A) ..................................................................... 46

Fed. R. Evid. 301 ..................................................................................... 44

**Regulations:**

22 C.F.R. § 121.01(VIII)(c) (1983) ......................................................... 30

32 C.F.R. § 1-1505(c)(iii) (1983) ............................................... 11, 53, 56

32 C.F.R. § 7-104.29 (1983) ..................................................................... 57

32 C.F.R. § 7-104.39 (1983) ............................................... 65, 66, 67, 69

32 C.F.R. § 16-206.1 (1983) ....................................................................29

**Legislative Materials:**

S. Rep. No. 99-345 (1986) ....................................................................45

**Other Authorities:**

Pindyck & Rubinfeld, *Microeconomics* 388 (8th ed. 2013) ...............................38

Restatement (Second) of Contracts § 196............................................................65

Restatement (Third) of Restitution and Unjust Enrichment § 2 ...................61

Restatement (Third) of Restitution and Unjust Enrichment § 2(2)...............61

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests oral argument. The district court correctly resolved this case, but oral argument might be beneficial to the Court in light of the size of the record.

# INTRODUCTION

This is a case about fraud.  The United States Air Force, seeking engines for F-15 and F-16 fighter jets, conducted a multi-billion dollar procurement that was governed by an extensive regulatory regime.  Pratt & Whitney, which manufactured the engines at issue, evaded that regime.

As Pratt understood, the company's prices could not exceed an honest estimate of its expected costs plus a reasonable profit.  Yet Pratt concocted a scheme to artificially inflate its expected costs, thereby justifying high prices.  And to conceal this scheme, Pratt lied to the Air Force about what it had done: Pratt asserted it had followed the rules, even though it knew that it had not.

Taking Pratt at its word, the Air Force agreed to the inflated engine prices.  Those prices prevailed for the contract's first two years.  And in later years, the inflated prices became the baseline against which the Air Force evaluated subsequent "discounts" that Pratt offered.  As a result, the government agreed to "discounted" prices that were actually far higher than what it would have received had Pratt told the truth from the beginning.  The district court properly accounted for that disparity, and its well-reasoned judgment should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345.

Final judgment was entered on July 1, 2013, and defendant timely

appealed.  *See* Fed. R. App. P. 4(a)(1)(B); RE#435; RE#436.[1]  This Court has

jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court properly calculated damages.

2.  Whether the district court properly rejected defendant's issue-

preclusion defense.

3.  Whether the parties' contract bars common-law claims for unjust

enrichment and payment by mistake, or an award of prejudgment interest.

## STATEMENT OF THE CASE

**A.    FACTUAL BACKGROUND**

**1.    The Engine Competition**

Pratt & Whitney ("Pratt") is a division of defendant United

Technologies Corporation.  *United States v. United Technologies Corp.*, 626

---

[1] Citations to District court Record Entry numbers are abbreviated "RE#_."  Applicable page citations are to PageID numbers.

F.3d 313, 315 (6th Cir. 2010). As of the early 1980s, Pratt was the Air Force's exclusive engine supplier for F-15 and F-16 fighter jets. *Id.*

At the time, Pratt's engines suffered from numerous technical and other problems. In an attempt to spur the development of better engines, the Air Force held a "competition" to fill its next generation of orders. RE#441-2 at 32493 (DX4); RE#443-5 at 35842 (PX1048)**;** RE#330 at 23309-23 (Nelson). Pratt's "competitor" was General Electric ("GE"), the only other company that could make appropriate engines. *United Technologies*, 626 F.3d at 315.

Consistent with the primary focus on improving engine quality, this acquisition was not conducted as a *price* competition. Thus, when the Air Force issued its Request for Proposal in May 1983, it expressly reserved the right to split the award between both manufacturers (instead of simply selecting the lowest bidder). RE#443-5 at 35842 (PX1048); RE#443-6 at 36027 (PX1048). And as a result, it understood the procurement to be lacking in "adequate price competition" under the governing regulations. *See* RE#441-5 at 32551 (DX33) (adequate price competition only exists when there are multiple bids, and the winner will be the "responsible offeror submitting the lowest evaluated price"); *In re United Technologies Corp.*,

3

2004 ASBCA LEXIS 15, at * 59-62 (A.S.B.C.A. Feb. 27, 2004) ("*Board Initial Decision*").

The absence of "adequate price competition" meant that both contractors had to provide cost and pricing data to the government. RE#441-5 at 32545-46; *Board Initial Decision* at *59-62. They also had to certify the accuracy of their cost estimates. RE#397 at 30902-03 (2008 Opinion). Among other things, the Air Force could use that information to determine if a contractor's prices were unreasonably high relative to its costs.

### 2. Pratt's Proposals

As a Pratt executive admitted, and as the district court found, Pratt understood that its prices "could not be higher than [its] expected reasonable costs … plus a reasonable profit." RE#344 at 24758-59 (Skemp); *see also* RE#397 at 30899. But if Pratt built up an intentionally inflated estimate of its underlying costs, it could charge higher prices while masking the full extent of its profit. Pratt proceeded to do exactly that when it provided its initial proposal to the Air Force in August 1983: it inflated its costs, *see* RE#397 at 30899-30900, then applied a disclosed profit margin to those costs, RE#443-30 at 37818 (PX2003D).

4

Initially, the strategy suffered a setback.  Government auditors examined Pratt's proposal and discovered a host of problems with Pratt's costs.  RE#397 at 30900-01.  Relevant here, they learned that Pratt had failed to incorporate some of its own internal cost projections; those projections ("PCAG recommendations")[2] showed that Pratt expected to reduce its costs significantly by negotiating lower prices from suppliers.  *Id.* at 30901; RE#443-20 at 36901 (PX1314).  The auditors also discovered that Pratt had formulated its cost estimates by using the parts for an outdated version of its engine, even though the current version used less expensive components.  *Id.* at 36902-07.

The auditors' findings were conveyed to Pratt, and the government told Pratt to "address … these issues" in its Final Offer.  RE#443-13 at 36771-72 (PX1071A); RE#397 at 30901-02; *see also* RE#443-4 at 35821 (PX410) (requiring Pratt to provide particularized explanations).  Nonetheless, when Pratt submitted its Final Offer[3] in December 1983, *see United Technologies*, 626 F.3d at 317, it did not correct these calculation problems.

---

[2] "PCAG" refers to an internal Pratt organization that analyzes suppliers' price quotes.  RE#348 at 25428-31 (Schwartz).

[3] The Final Offer was captioned "Best And Final Offer," colloquially called the "BAFO" during trial proceedings.

Instead, it persisted in using inflated cost estimates, RE#397 at 30902-07, thereby inflating the figure to which it applied its profit margin.  And to cover this up, Pratt's Final Offer told the Air Force a series of lies.

First, Pratt claimed it had reduced its cost estimates based on its internal group's projections, as well as its past experience with that group's accuracy.  RE#441-9 at 32972 (Final Offer).   In truth, Pratt failed to incorporate the described reductions, resulting in overstated costs.  *United Technologies*, 626 F.3d at 317.

Second, Pratt claimed that it had updated its cost data so that it was based on suppliers' quotes for the most recent version of the engine.  RE#441-9 at 32973.  In fact, Pratt continued to base its cost estimates on superseded quotes, and the outdated and pricier engine configuration.  *United Technologies*, 626 F.3d at 317.

Third, Pratt claimed that it had revised its cost estimates to reflect the latest published inflation forecast, which was lower than the older forecast used in the initial proposal.  RE#441-9 at 32972.  In reality, Pratt had not incorporated the lowered forecast, leading it to claim increased costs.  *United Technologies*, 626 F.3d at 317; RE#397 at 30906.

Ultimately, Pratt falsely certified in its Final Offer that its prices reflected its best estimate of its expected costs. *See* RE#397 at 30902-04. Pratt continued to claim that its profit margin was "unchanged" from the rate asserted in its initial proposal, RE#441-9 at 32943, which the Air Force had not questioned.

### 3.    Evaluation And Acceptance

The Air Force examined Pratt's Final Offer. In doing so, it did not audit certain underlying data that Pratt had submitted separately from the Final Offer; such cost or pricing data were typically only used later during post-contract audits. RE#325 at 22521 (Nelson); *id.* at 22597-98 (Wyatt); *Board Initial Decision* at *12. Rather, the Air Force relied on Pratt's representations in the Final Offer *itself*: the Air Force took Pratt at its word that its calculations were honest, accurate, and complete, and it accepted Pratt's written assurances in the Final Offer that the earlier-discovered problems had been addressed. *Id.* at 22601-02, 22611-13 (Wyatt); RE#346 at 24976, 24980 (Hansman); RE#443-14 at 36798-99, 36810-11 (PX1079); RE#443-15 at 36813 (PX1087) (paragraphs 5-6). Based on these assurances, the Air Force concluded that Pratt's proposed prices were "fair and reasonable," RE#425 at 32295 (2012 Opinion); RE#443-14 at 36798-36800

7

(PX 1079), and it signed a contract with Pratt. *United Technologies*, 626 F.3d at 317. It also signed a contract with GE. *Id.*

Under its contract with Pratt, the Air Force had the right to buy engines in each fiscal year between 1985 and 1990. *Id.*; RE#441-22 at 34105 (Contract) (option 3). Every year, the engine price would be determined using a pre-defined matrix, with the exact price dictated by the number of engines purchased. RE#441-22 at 34105; RE#441-11 at 33070.[4]

Pratt's engine prices were also subject to one other potential adjustment. If the Air Force bought none of its engines from GE (a "full award" to Pratt), Pratt would give the Air Force a small percentage "discount" in the contract's last four years, ranging from 1.3% in fiscal 1987 up to 6.4% in fiscal 1990. *See* RE#441-22 at 34105 (option 3). No discount would be applicable in the first two years (fiscal 1985 and 1986). *Id.* Thus, even with a full award, Pratt would charge the Air Force between 100% and 93.6% of its inflated prices, depending on the year.

---

[4] In the contract's last three years, prices were further subjected to an "Economic Price Adjustment." After the government submitted payment, matrix prices would be adjusted under a set formula, using updated inflation figures. The government would then owe additional money to Pratt, or Pratt would owe a partial refund, depending on the actual rate of inflation. RE#357 at 27051-53 (Williams); RE#441-21 at 33938-40 (Contract).

Pratt's goal in creating these "discounts" was to discourage the Air Force from awarding any engines to GE (a "split award"). RE#397 at 30898.[5] It also pursued that goal by offering a much more expensive warranty price if the Air Force chose a split award. *See* RE#325 at 22454 (Nelson). Nonetheless, the Air Force split the award, and it gave the lion's share of the overall award to GE in the first year; the Air Force noted at the time that Pratt's warranty was quite expensive in a split-award scenario, and yet Congress had required the Air Force to purchase a warranty for the procured engines. RE#397 at 30907; RE#443-25 at 37361 (PX1349)**;** Pub. L. No. 97-377, § 797, 69 Stat. 1830, 1865 (1982). Pratt did win all the F-15 orders that year (but no F-16 orders). RE#443-25 at 37361. Pratt's success with the F-15 apparently reflected the fact that GE's engines could not fit in that aircraft without expensive modifications. *See* RE#330 at 23366-68 (Nelson) (describing the physical issues with GE's engines).

---

[5] Indeed, justifying the higher split-award prices was a key motivation for the fraud. *United Technologies*, 626 F.3d at 317. Nonetheless, as the previous paragraph explained, Pratt stood to benefit from inflated prices in either scenario.

### 4.    The Warranties

As noted, Pratt's Final Offer included warranty prices that were comparatively quite expensive in the split-award scenario, which the Air Force selected.  But Pratt's warranties (in both split- and full-award contexts) placed no financial limit at all on Pratt's liability.  *United Technologies*, 626 F.3d at 317; *see also* RE#441-20 at 33896-33910 (Contract).

Pratt's high warranty prices attracted Congressional attention, and Congress enacted a statute that barred the Air Force from buying jet engines if the warranty price exceeded 10% of the contract price.  *Id.* at 317; *see also* Department of Defense Authorization Act, 1985, Pub. L. No. 98-525, § 103(b), 98 Stat. 2492, 2502 (1984).  Pratt's warranty prices exceeded this threshold, and Pratt and the Air Force therefore agreed to a modification: Pratt would reduce its warranty price, but in exchange it would place "a $17.22 million cap on its previously unlimited liability."  *United Technologies*, 626 F.3d at 317.  This was an important change, as the Air Force had considered Pratt's uncapped warranty to be assuming "a large risk."  RE#346 at 25043 (Hansman)**;** *see also* RE#441-4 at 32532 (DX19).

### 5.    The Improvements

Although the governing contracts gave the Air Force options to order engines from Pratt and GE for each of six-years, at pre-defined prices and terms, before exercising those options the Air Force had a regulatory duty to see if it could obtain better terms.  Thus, the Air Force annually asked Pratt and GE if they were willing to offer "improvements" to their respective contracts.  *United Technologies*, 626 F.3d at 318.

In soliciting these improvements, the Air Force was careful to note that it "did not intend to and will not conduct an additional formal competition."  *Id.* (internal quotation marks omitted).  Moreover, the Air Force had to evaluate the proposed improvements against the option prices it had already accepted.  If the proposed "improvements" were actually worse than what the Air Force already had, the Air Force would reject them.  *See* 32 C.F.R. § 1-1505(c)(iii) (1983).

Pratt responded with various offers that the government accepted. *United Technologies*, 626 F.3d at 318.  Some of these related to non-price terms.  *E.g.*, *Board Initial Decision* at *22.  But five changes related to the actual prices the Air Force paid.

First, in an attempt to secure more business, Pratt agreed to give the government the "full-award" engine prices even though the Air Force had split the award.  RE#443-17 at 36819 (PX1114); *Board Initial Decision* at *73-74.  As explained above, this did not affect Pratt's prices for the first two years of the contract.  *See supra* p. 8.  For the remaining four years, it meant the Air Force would receive small percentage "discounts" off of Pratt's inflated prices, with annual "discounts" ranging from 1.3% to 6.4%.  *Id.*

Second, Pratt agreed to sell some additional engines to the government, even though it had the right to refuse to do so.  Because the Air Force was purchasing a larger quantity of engines, it qualified for slightly lower per-engine prices under Pratt's pre-existing (and inflated) pricing matrix.  *See* RE#354 at 26448-49, 26464-65, 26525-26 (Rhodeback); RE#443-2 at 35793 (DX303); RE#356 at 26998 (Brown).

Third, Pratt agreed to alter the contract's "Economic Price Adjustment" clause.  That clause had created a procedure which adjusted prices during the contract's last three years, dependent on future inflation figures.  *See supra* p. 8 n.4.  The Air Force determined that the clause as written violated Air Force policy, *see* RE#441-30 at 34726 (DX306), and Pratt agreed to a compliant revision that changed the clause's scope, RE#443-17

12

at 36818 (PX1114). Because actual inflation ended up being less than forecasted, the change ultimately benefitted Pratt, which received about $53.6 million more in payments because of it. RE#370 at 29404 (Williams).[6]

Fourth, in the last year of the contract, Pratt cut its (inflated) engine prices by a flat 0.5%. RE#354 at 26593 (Rhodeback).

Fifth, and finally, Pratt agreed to assorted reductions in its warranty prices in years two through six, beyond the initial reduction it made when it first imposed a liability cap. RE#441-44 (PX 1499). To get these lower prices, the Air Force *also* had to agree to lower liability caps, since Pratt's offers always set its maximum liability at three times the warranty price. RE#365 at 28531-33 (Rhodeback).

\*　　\*　　\*

The Air Force ultimately purchased more than 1,000 engines from Pratt. RE#443-19 at 36824 (PX1196). Auditors later determined that Pratt received approximately $3.2 billion in payment for its engines, on only about $2.6 billion in costs. RE#443-18 (PX1192). Thus, even after

---

[6] For funding purposes, some additional changes were also made to the Economic Price Adjustment clause and the linked matrix prices; these changes were "performed such that there was no effect on final prices." RE#443-3 at 35798 (PX114).

accounting for its various "discounts," Pratt managed to achieve a profit margin of about 23% on its engine sales—a rate that Pratt itself considered excessive when negotiating purchases from its own suppliers.  *See* RE#352 at 26074-75 (Messer).

Indeed, Pratt's fraud was so successful that in every year of the contract, Pratt's "discounted" final engine prices were substantially more than the prices it would have offered had it (1) actually calculated its Final Offer prices in the manner it claimed to, and (2) never given the government any "discounts" at all over the next six years.  *See* RE#397 at 30908 (second full paragraph) (providing data to calculate the dollar value of Pratt's engine price discounts); RE#433 at 32446 (2013 Opinion) (calculation of inflated prices).[7]  That total difference was well in excess of $190 million.  *See* RE#397 at 30908 (second full paragraph); RE#433 at 32446.  Pratt's "discounts" thus paled in comparison to its initial fraud.[8]

---

[7]  Comparing the cited data actually underestimates how much Pratt's inflation exceeded its discounts, since it gives Pratt double credit for some reductions.  *See infra* pp. 45-46.

[8] Pratt presents different figures in its chart, *see* Br. 9, because it (1) includes the warranty discounts, and (2) assumes the warranty liability cap was meaningless.  *Id.*  This Court, however, rejected that approach to valuation.  *United Technologies*, 626 F.3d at 322.

14

## B.    PRIOR PROCEEDINGS

Years later, an auditor uncovered Pratt's manipulations.  *United Technologies*, 626 F.3d at 318.  Two proceedings ensued.

### 1.    The Board

The first proceeding was under the Truth In Negotiations Act (TINA), 10 U.S.C. § 2306(f) (1982).  Where TINA applies, contractors must submit "cost or pricing data" to the government and certify its accuracy before the contract is signed.  *Id.* § 2306(f)(1).  TINA further requires that governed contracts contain a special TINA clause; that clause allows the government to retroactively adjust prices to exclude increases attributable to the submission of defective "cost or pricing data."  *Id.* § 2306(f)(1).

Pratt's contract was governed by TINA and had the required TINA clause.  The Air Force administratively invoked that clause, and a contracting officer eventually determined that the Air Force was due a substantial refund.  *Board Initial Decision* at *35-46.

Pratt sought review before the Armed Services Board of Contract Appeals ("Board").  *Id.* at *1.  The Board sustained the Air Force's conclusion that the contracting process had been lacking in "adequate price competition," triggering Pratt's duty to submit accurate "cost or pricing

15

data" under TINA.  *Id.* at *59-62.  Nonetheless, the Board held that Pratt's
Final Offer was not itself "cost or pricing data" for TINA's purposes,
precluding any TINA remedy.  *Id.* at *64-66.  In doing so, the Board
expressly declined to rule on any non-TINA theory that might provide
compensation for the lies in Pratt's Final Offer.  *Id*. at *66.

   The Board did conclude that Pratt's underlying data was defective
"cost or pricing data," upon which the Air Force had relied and suffered
damages.  But it also held that Pratt was entitled to various credits due to
alleged underpricing.  *Id.* at *66-82.

   Both sides sought reconsideration, and the Board amended its
opinion.  In key part, the Board explained that it had confused the cost and
pricing data submitted with Pratt's initial proposal (in August 1983) with
the cost and pricing data submitted with Pratt's Final Offer (in December
1983).  *In re United Technologies Corp.*, 2005 ASBCA LEXIS 10, at *4-5
(A.S.B.C.A. Jan. 19, 2005) ("*Board Reconsideration Decision*").  That
distinction was important, in the Board's view, because the latter set of
underlying data had never actually been reviewed by the Air Force when
evaluating Pratt's Final Offer and later proposed improvements.  Thus, the
Board concluded that the defective "cost or pricing data" from December

1983 had not been relied upon by the government for any year of the

contract, precluding any TINA award.  *See id.* at *4-11.  The Board did not

revisit its conclusion that the Final Offer itself did not constitute "cost or

pricing data" under TINA, and thus the reconsideration decision did not

examine any effect that Pratt's statements in that Final Offer might have

had on the Air Force.  *See id.*

The Federal Circuit sustained the Board's no-reliance holding with

regard to the underlying "cost or pricing data."  *Wynne v. United*

*Technologies Corp.*, 463 F.3d 1261, 1264-67 (2006).  Like the Board, the

Federal Circuit did not address whether, and to what extent, the Air Force

had relied on Pratt's false statements in the Final Offer itself.

### 2.    The Current Lawsuit

Separately, the United States filed suit in the Southern District of

Ohio.  The operative complaint alleged that Pratt defrauded the

government by making false statements in its Final Offer.  As a result, the

government sought damages under the False Claims Act, 31 U.S.C.

§ 3729(a), as well as under the common law for unjust enrichment and

payment by mistake.  RE#334 at 23737-38, 23739-40 (Third Amended Complaint).[9]

After a lengthy bench trial, the district court entered judgment for the government under the False Claims Act.  The court explained that Pratt's Final Offer had contained numerous false statements, which were material to the government's payment decisions, and it therefore awarded civil penalties for those claims that fell within the statute of limitations (claims paid on or after March 3, 1989).  RE#397 at 30911-16.  But the court declined to award damages on those claims.  The court instead gave Pratt a complete offset for the "savings" between the warranty and engine prices in Pratt's Final Offer, and the prices the government eventually paid.  *Id.* at 30915-16.  The court also held that the government's common-law theories were foreclosed by principles of claim preclusion.  *Id.* at 30916-17.

This Court affirmed the district court's liability analysis, agreeing that Pratt had violated the False Claims Act and that its fraud was material to the government's payment decisions throughout the entire six-year life of

---

[9] The complaint also articulated a claim for breach of contract, *see* RE#334 at 23738, which has since been dropped.

18

the contract. *United Technologies*, 626 F.3d at 319-21. The Court reversed on two other issues.

First, the Court rejected the "no damages" finding. The district court had erroneously given Pratt credit for the price reductions on its warranties, without recognizing that the government had given something in return when it agreed to Pratt's liability caps; those caps meant that the government got "far less insurance" for defective engines. *Id.* at 321-22. Also, this Court found that the district court erroneously gave Pratt credit for its "discounts" off the fraud-inflated Final Offer prices—prices that even Pratt did not think represented "the fair market value of the goods the government received." *Id.* The proper approach, this Court held, was to calculate the difference between "what the government eventually paid each year" and what "it should have paid each year." *Id.* The Court termed the latter figure "the fair market value." *Id.*

The Court also held that claim preclusion did not bar the government from pursuing its common-law theories. *Id.* at 324-25. In light of the structure of the Contract Disputes Act (which governs Board proceedings and carves out fraud-related matters), the government properly litigated its

19

fraud-based common law claims in a separate district court action. *Id.* at 323-25.

On remand, the district court made additional rulings and factual findings. The court rejected Pratt's argument that issue preclusion prevented the government from arguing that it relied on the misrepresentations in Pratt's Final Offer. The Board and the Federal Circuit had concluded that the Air Force did not rely on the *underlying cost and pricing data*, whereas the government's common-law claims were based on reliance on Pratt's false *statements*, which were made in the Final Offer itself. RE#425 at 32288. Since the two issues were different—indeed, the Board had expressly left the latter issue unresolved—issue preclusion was inapplicable. *Id.* at 32288-89. The court further concluded, as a factual matter, that the Air Force had read and relied on Pratt's false statements when it concluded that Pratt's prices were fair and reasonable: it credited witness testimony to that effect, as well as an official Air Force record. *Id.* at 32294-95. This made Pratt's statements quite unlike the underlying cost and pricing data (which the Air Force had not examined during its final evaluation).

The district court also rejected Pratt's argument that the parties' contract precluded federal common-law remedies. The court noted that Pratt had identified no contractual provision that precluded such remedies. And the contract's TINA clause (which Pratt had never invoked) only governed remedies for defective "cost or pricing data;" Pratt's Final Offer statements were not within that scope. *Id.* at 32290-92.

Finally, the court calculated damages, following this Court's instruction to subtract what the government "should have paid" each year from what it "eventually paid each year." *United Technologies*, 626 F.3d at 322; *see also* RE#433 at 32443. In determining that figure, the court rejected as outdated and inaccurate various prices and estimates that Pratt had invoked. RE#433 at 32443-44. The court also rejected the idea that it should look to the engine prices the Air Force eventually paid Pratt and GE: neither producers' prices were "reflective of [the] fair market value" of Pratt's engines since Pratt's prices were "the product of fraud" and GE's prices reflected costs "entailed in market entry." *Id.* at 32445. Instead, in this market "with only two sellers and one buyer," and in which the ultimate engine prices "derive[d] from [a] regulatory system" that placed significant constraints on the parties, the court adopted in full the

21

uncontradicted testimony and approach of the government's damages expert, Dannie Zacheretti. *Id.* at 32445-46.

Zacheretti's approach was simple. He first calculated what Pratt's estimated material costs would have been if Pratt had been telling the truth (*i.e.*, if it had used the methods and data it assured the Air Force it had used in its Final Offer). Then, applying the same percentage markups that Pratt had used for profits, discounts,[10] and other factors, Zacheretti calculated the amount by which Pratt's prices would have changed if Pratt had used the correctly-estimated material costs. RE#363 at 28247-48 (Zacheretti); RE#364 at 28362, 28401-03 (Zacheretti); RE#366 at 28712-17, 28855 (Zacheretti). Because he used the same markups Pratt had used, Zacheretti's calculation also fully addressed Pratt's later engine price reductions, since those reductions were captured within the markup percentages. RE#366 at 28712, 28716-18. On the basis of Zacheretti's fully-credited testimony, the district court concluded that the Air Force had paid

---

[10] Mathematically, a discount can be represented as a percentage "markup" less than one. For example, a 3% discount is equivalent to multiplying by 0.97.

a total of $227,980,978 more than fair market value over the course of the contract.  RE#433 at 32450-51.

Next, the district court concluded that Pratt's capped warranties were worth exactly what the Air Force paid for them, eliminating Pratt's claim to an offset.  As a factual matter, the court found that the Air Force was well aware that Pratt's capped warranties had significantly less value than its previously uncapped warranties.  *Id.* at 32452.  And it further ruled that in the course of negotiating the revised warranties and their prices, Pratt and the Air Force had more regulatory freedom than when negotiating engine prices.  Thus, in the absence of Pratt pointing to any other evidence that established the value of its capped warranties (other than the original uncapped prices), the court accepted as fair market value the price that a willing seller (Pratt) and a willing buyer (the Air Force) had agreed upon. *Id.* at 32451-53.

Lastly, the district court (1) awarded the Air Force prejudgment interest on its common law claims (the portion of the government's damages pre-dating March 3, 1989); (2) trebled the remaining damages as required by the False Claims Act; and (3) added in the civil penalties this Court previously affirmed.  *Id.* at 32453-56.

## SUMMARY OF ARGUMENT

Pratt engaged in fraud to evade the governing regulatory structure. Had Pratt instead been truthful from the beginning, the Air Force would have paid far less for Pratt's engines, and the district court recognized that basic fact in its award. There is no basis to disturb the court's well-considered conclusion.

1. Pratt attacks the court's damages calculation, contending that it improperly determined the "fair market value" of Pratt's engines. But fair market value must account for the relevant regulatory structure, *see United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950), which here meant that Pratt's prices could not exceed its honestly expected costs plus a reasonable profit. The district court thus properly determined that the "fair market value" of Pratt's engines was the price Pratt would have charged had it not been evading the regulatory regime—*i.e.*, the price Pratt would have charged had it actually done what its Final Offer claimed.

Pratt's contrary arguments concerning "fair market value" improperly focus on the prices that might have governed if there had been a hypothetical open and unregulated market, or if Pratt's very different costs had been the same as GE's. And while Pratt develops an elaborate

24

argument that the district court somehow disregarded "fair market value,"
that argument is without foundation.  Pratt wrongly conflates *open* market
value (which is irrelevant to these engines' prices) with *fair* market value
(the measure ordered by this Court, and expressly adopted by the district
court).

Because the district court followed Supreme Court precedent, and
thus properly accounted for the role that Pratt's estimated costs and profit
played within the governing regulatory structure, the court's methodology
was correct.  But even if this were an ordinary market, the court's approach
to valuation was nonetheless entirely appropriate.  A court cannot use the
"comparable sales" method when there are no sufficiently comparable
sales, *see United States v. 103.38 Acres of Land*, 660 F.2d 208 (6th Cir. 1981),
and here the district court made factual findings precisely to that effect.
Pratt does not challenge those findings.  Thus, the district court properly
adopted a cost-based approach, which is a recognized and legitimate
valuation method when there are no sufficiently comparable sales.

Pratt's remaining damages objections are essentially factual.  It
criticizes the expert's methodology, but his approach was both reasonable
and appropriate, and especially so in light of this Court's instructions and

25

the uncertainty created by Pratt's own fraud. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946). Indeed, the expert's approach may have been too generous to Pratt.

Pratt also objects to the court's treatment of the warranties, but much of the argument is waived because it was never raised before the district court. In any event, the court reasonably accepted the prices that Pratt and the Air Force agreed to, which if anything may have been too *high* because Pratt's inflated cost estimates likely skewed the Air Force's expectations regarding the engines' replacement and repair costs. Moreover, the court properly recognized that the governing regulatory structure did not interact with Pratt's revised warranty prices in the same way that it affected Pratt's engine prices.

2. Pratt also argues for issue preclusion, invoking the Board's prior decision to assert that the Air Force did not rely on Pratt's false representations during the contract's last five years. But as the district court properly recognized, the Board never addressed the effect of Pratt's representations in the Final Offer, which the Air Force read and relied on. Instead, the Board only addressed the underlying cost and pricing data, which the Air Force did not examine. The Final Offer representations were

important, and they caused the Air Force to agree to inflated prices that governed all six-years of the contract.  Those inflated prices then became the (inflated) comparators that the Air Force used when evaluating purported "discounts" that Pratt and GE later offered, again leading to significantly inflated prices.  Nothing in the Board's decision undermines that obvious causal chain.

3.  Pratt cannot invoke the contract's TINA clause, which was statutorily mandated, to preclude the government's common-law remedies.  Pratt waived the argument by failing to invoke the clause in the district court.  Moreover, Pratt ignores the long-recognized rule that the government's common-law remedies can only be precluded by unmistakably clear statutory language, which TINA does not contain.  In any event, Pratt's argument fails under ordinary common-law principles because the TINA clause does not govern the kind of fraud at issue here, and because the common law separately prevents a party from invoking contractual bars when the contract itself was procured through fraud.

Pratt also invokes the contract's interest clause, which does not allow the government to collect interest for "amounts that become payable … to the Government under this contract" unless certain procedures are

27

followed.  But the government's damages were not due "under this

contract," rendering this clause irrelevant.  Rather, Pratt owed damages

because the government successfully pursued non-contractual, common-

law claims, based on pre-contract fraud.

## STANDARD OF REVIEW

The district court's factual findings made after a bench trial are

reviewed for clear error.  *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629,

633 (6th Cir. 2012).  This standard is highly deferential; if the district court's

account of the evidence "is plausible in light of the entire record," this

Court will not reverse.  *Id.*  (internal quotation marks omitted).  The district

court's legal conclusions are reviewed *de novo*.  *Id.*

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY CALCULATED DAMAGES

### A.    The District Court Precisely Followed This Court's Mandate

Pratt's principal objection is that the district court did not follow this

Court's mandate.  Pratt is incorrect.

1.  In remanding the case, this Court instructed that the proper

measure of damages was "the difference between what [the government]

paid and what it should have paid" for the items received.  *United*

*Technologies*, 626 F.3d at 321.  The Court referred to the latter figure as the engines' "fair market value."  *Id.* at 322.  Thus, the district court had to calculate "fair market value" by determining the price the government "should have paid," which was the price Pratt's engines would have commanded in the relevant market absent Pratt's fraud.

That "fair market value" had to be computed with regard to the actual market in which the fraud took place, including any governing requirements that would have affected the parties' prices.  *See United States v. Commodities Trading Corp.*, 339 U.S. 121, 123-24, 130 (1950) (recognizing that in a market with government price controls, the fair market value was the controlled price, not the hypothetical price that could have been obtained in an open market); *United States v. Cartwright*, 411 U.S. 546, 552 (1973) (fair market value takes into account any rules that determine what may be included in an asking price); *United States v. Warshawsky*, 20 F.3d 204, 212-13 (6th Cir. 1994) (because defendant operated in the wholesale business, district court erred in measuring "fair market value" through retail prices), *superseded on other grounds as stated in United States v. Vigil*, 644 F.3d 1114, 1120 (10th Cir. 2011).

In this case, the relevant market had several key regulatory features. Most importantly, in the context of an Air Force determination that there was a lack of "adequate price competition," *see supra* pp. 3-4, Pratt had to propose prices that reflected its best estimates of its expected costs. RE#397 at 30902-04; *see also* 32 C.F.R. § 16-206.1 (1983). It was further required to certify the accuracy of its cost estimates, RE#397 at 30902-04, which of course meant that Pratt in effect had to also disclose its expected profit (the difference between cost and price). Indeed, the district court expressly found in its original opinion that Pratt's prices "had to be the sum of its expected cost, plus a reasonable profit." *Id.* at 30899. And a key Pratt executive admitted that Pratt understood this. *See* RE#344 at 24758-59 (Skemp). Pratt's brief disputes neither the district court's finding, nor its executive's admission.

Other regulatory restrictions were also important. Before contract acceptance the Air Force had to conclude that Pratt's prices were "fair and reasonable." RE#346 at 24965 (Hansman). Moreover, as the district court recognized (and Pratt has not disputed), the government was the only buyer to whom Pratt could sell its engines. *See* RE #433 at 32445; *see also* 22

U.S.C. § 2778 (1982) (Export Control Act) & 22 C.F.R. § 121.01(VIII)(c) (1983) (list of restricted items).[11]

Together, these features would be expected to materially change prices relative to what might prevail in a wholly open and unregulated market. And Pratt agreed to participate.

2. Given the regulatory structure, the appropriate way to calculate fair market value was to determine the prices that Pratt would have charged had it played by the rules instead of engaging in fraud. And that is precisely what the district court did when it adopted Zacheretti's testimony. RE#433 at 32446. Zacheretti calculated the difference between what the government actually paid for Pratt's engines, and what the government would have paid if Pratt had used the pricing methodology it claimed to have used in its Final Offer (*i.e.*, the methodology consistent

---

[11] Pratt has not contended that it possessed a license that would have authorized direct foreign sales. *Cf. Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1040 (9th Cir. 1983) (relevant market included direct "commercial sales" to foreign countries). By contrast, the United States itself could transfer engines directly to certain foreign countries. *See* 22 U.S.C. § 2761(a) (1982). Pratt implies the government made a profit on these re-sales, Br. 39, but the document it cites shows no such thing. *See* RE #441-20 at 33922 (Contract) (indicating that engines destined for foreign re-sale cost the government more than domestic engines).

with the governing regulatory regime). *See* RE#363 at 28247-48; RE#364 at 28362, 28401-03; RE#366 at 28855. The latter figure, which represented Pratt's honestly expected costs plus its claimed profit margin, is of course the fair market value in this specific market. And thus Zacheretti's ultimate figure was fully consistent with this Court's definition of the appropriate damage measure as the difference between the actual price paid, and what the Air Force should have paid.

Pratt argues that the district court discounted various other measures of value. *See* Br. 28-30. But that underscores Pratt's misunderstanding of the relevant market, and its refusal to acknowledge the district court's factual findings.

The prices GE proposed for its engines—which were physically distinct and involved different parts, *see* RE#441-3 at 32501, 32503 (DX11)**;** RE#330 at 23366-68 (Nelson)—were not a valid measure of the permissible prices for Pratt's engines, which necessarily had different costs. Moreover, as the district court found (and Pratt has not contested), GE's late entry into the market gave it unique costs that Pratt did not experience. *See* RE #433 at 32445. Within the relevant regulatory scheme, the proper question was

what *Pratt* would have charged for *Pratt*'s engines, and thus the district

court correctly discounted GE's sales information.  *See id.*

Similarly irrelevant is speculation about the prices that might have

governed in a hypothetical and nonexistent market with additional buyers

bidding up prices.  Moreover, because Pratt's prices were tied to its

honestly expected costs for its engine, prices derived from old estimates,

outdated sales data, or outright fraud could not measure fair market

value.[12]  The district court thus properly rejected that information as well.

*See id.* at 32443-45.  Indeed, it should be obvious that the proper prices are

not *ipso facto* the ones that Pratt and the government agreed to, since those

prices were distorted by a fraud that evaded the governing regulatory

requirements.  *Accord United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551

(1943) (False Claims Act's "chief purpose" was to provide restitution when

money is "taken from [the government] by fraud"); *United States ex rel.*

*Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998) (False

---

[12] As the district court explained, the Air Force's "[i]ndependent"
estimate was not actually independent since it was based on Pratt's inflated
cost information.  RE #433 at 32444.  Moreover, that estimate added in a
25% "cushion" for part of the engine, on top of the inflated information.
*Id.*; *see also* RE#443-1 at 35714 (DX131).

Claims Act damages are generally "liberally calculated to ensure" the government receives a complete remedy).

This Court's earlier opinion confirms the correctness of the district court's approach.  During the prior appeal, Pratt vigorously contended that every price the Air Force agreed to—including the original Final Offer price for fiscal 1985— represented "fair market value" in light of "competition" from GE.  Br. for Appellee, Cross-Appellant, at 53-55, *United States v. United Technologies Corp.*, 626 F.3d 313 (6th Cir. 2010).  But this Court explained that "[n]either party maintains that the 1984 contract prices represent the fair market value of the goods the government received or that the government should have paid those prices."  *United Technologies*, 626 F.3d at 322.  The implication was thus that the appropriate prices were the prices that would have governed in the absence of fraud.

Further illustrating the point, this Court understood Pratt to be arguing that the "goods" (*i.e.*, the engines themselves) had been sold "below fair market value."  *Id.*  But Pratt's only argument that the Final Offer prices were *underpriced* was based on its theory that Pratt had underestimated various costs, such that its prices would actually have been higher if calculated as claimed in the Final Offer.  Br. for Appellee, *supra*, at

58-60.[13]  Thus, when this Court understood Pratt to be arguing that the engines had been priced below "fair market value," it was because the term referred to prices calculated in accordance with Pratt's representations.

Pratt's alternative approach to "fair market value" defies common sense.  Pratt lied to justify prices it thought it could not offer legitimately, and to deceive the Air Force into thinking that Pratt had addressed the auditors' concerns.  Accepting Pratt's approach would let it retain the very ill-gotten gains the regulatory system was designed to avoid.

3.  Pratt presses other objections that lack merit.  Pratt states that the district court "reject[ed] fair market value."  Br. 24-28.  That is incorrect. The district court expressly recognized that it had to "find and account for the fair market value" of Pratt's engines.  RE#433 at 32442.  The court made specific and unambiguous factual findings about "fair market value" for every single year of the contract.  *Id.* at 32451.  And the court repeatedly discussed "fair market value" in its analysis.  *Id.* at 32444-49.[14]

---

[13] Pratt's underestimate claims were rejected on remand.  *See* RE#433 at 32447-50.  Pratt has not renewed them on appeal.

[14] Nor did the government urge the district court to disregard "fair market value." Br. 22-23.  The government embraced that measure and supported the district court's approach.  RE#417 at 32059-73.  Pratt cites

*Continued on next page.*

Pratt's real objection is not that the district court disregarded *fair* market value, but rather that it rejected the relevance of some hypothetical *open* market value (that is, the prices the engines would have fetched in an imagined market that was fully open to other buyers and in which there was "adequate price competition"). *See, e.g.*, Br. 24-25. As previously explained, such hypothetical prices have no relevance to this regulated market.

Pratt's conflation of "fair market" value with "open market" value also answers its assertion that the district court "misallocate[ed] … the burden of proof." Br. 25. The district court actually said that Pratt had not "proven" the prices that the "engines might fetch in an *open* market." RE#433 at 32445 (emphasis added). The court's point was merely that "open market" prices are hard to discern in this context in addition to being irrelevant. *Id.* To answer the relevant question—*fair* market value— the court ruled by crediting uncontradicted expert testimony and other evidence, not through burden-shifting. *Id.* at 32443-47.

---

one sentence out of context; the government's point was that damages could not be determined without reference to "the difference between what the government actually paid and what it should have paid." *Id.* at 32073.

Pratt also levies a factual attack on the district court's finding that, by participating in the regulated market, "United Technologies and the Air Force agreed [the engines] were worth the cost of the parts plus a fixed profit." *Id.* at 32445. The district court was exactly right, and certainly did not commit clear error. A key Pratt executive admitted he understood that, in the context of this procurement, Pratt's prices "could not be higher than … Pratt's expected reasonable costs … plus a reasonable profit." RE#344 at 24758-59 (Skemp). And the Air Force accepted Pratt's offer thinking that Pratt had simply applied its disclosed profit margin to its expected costs.

Pratt transforms the district court's eliding of the word "expected" into an argument that the court believed this was a "cost-plus" procurement—a technical term for procurements in which fixed prices are not established at the outset of a contract, and payment is owed based on *actual* rather than *estimated* costs. *See* Br. 25-26. But the district court never said this was a "cost-plus" procurement, and it referenced the correct regulations rather than the "cost-plus" regulations. RE#433 at 32446 (discussing "regulations under which the D[D]633s were produced"). Moreover, its earlier opinion correctly recognized that "Pratt's price had to be the sum of its *expected* cost, plus a reasonable profit." RE#397 at 30899

37

(emphasis added).  Read in light of its earlier findings (and the executive's admission) the court's point was simply that Pratt could not create prices that were not tied to its honestly expected costs.

## B.    Even In A More Ordinary Market, The District Court's Approach Would Have Been Correct

Because the district court accounted for the market's regulatory structures, its damages calculation was correct.  But even if this Court were to put aside the unique regulatory structure, and view this as simply an ordinary market with two sellers and one buyer (an attribute Pratt has never disputed), the district court's approach was still entirely proper.

"Fair market value" generally refers to the price at which an item "would change hands between a willing buyer and a willing seller" when both have "reasonable knowledge of relevant facts."  *Gross v. Commissioner*, 272 F.3d 333, 342 (6th Cir. 2001) (tax law); *see also*, *e.g.*, *United States v. 103.38 Acres of Land*, 660 F.2d 208, 211 (6th Cir. 1981) (just compensation).  Yet determining that price can be complicated in a market with very few sellers and very few buyers.  *See Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 276 (7th Cir. 1992) (Posner, J.); Pindyck & Rubinfeld, *Microeconomics* 388 (8th ed. 2013).  And different methods can be permissible.

The preferred valuation method typically looks at "comparable sales." *103.38 Acres*, 660 F.2d at 211. But this method requires the relevant sales to be sufficiently comparable. *Id.* When they are not, "the trier of fact … must resort to other means of determining fair market value." *Id.* And one "traditionally accepted" alternative is a cost-based approach. *See Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111 (6th Cir. 1984) (recognizing the legitimacy of cost-based methods); *United States v. 0.376 Acres of Land*, 838 F.2d 819, 827 (6th Cir. 1988) (Krupansky, J., concurring) (same); *Technicolor Motion Picture Corp. v. Westover*, 202 F.2d 224, 229 (9th Cir. 1953) (endorsing a cost-based methodology). Indeed, Pratt essentially concedes this point when it contends that a cost-based measure—the Air Force's "independent" estimate—was relevant to fair market value. *See* Br. 29, 39; RE#443-1 at 35704-14 (DX131).

In this case, the district court properly concluded that all proffered comparable sales were insufficiently comparable—either because they were out of date (*i.e.*, sales of Pratt's old engines); because they were derived from fraud (*i.e.*, sales of Pratt's new engines); or because they reflected another company's unique costs of market entry, which were

39

inapplicable to Pratt (*i.e.*, sales of GE's engines).[15]  RE#433 at 32443-46.

Given the lack of comparable sales, the court adopted an entirely

reasonable alternate valuation method: account for Pratt's true expected

costs, add a reasonable profit margin (that Pratt itself had chosen), then

reasonably infer that (1) Pratt willingly would have sold at such a price;

and (2) the Air Force willingly would have bought at that price.  *Id.* at

32446.  *Accord Whattoff v. United States*, 355 F.2d 473, 478 (8th Cir. 1966)

(finding a cost-based calculation reasonable since "the fair market price of

…  manufactured articles is normally the manufacturer's cost plus a

profit").

   The district court's finding that there were "no comparable sales" is

factual and entitled to significant leeway.  *See United States v. 2635.04 Acres

of Land*, 336 F.2d 646, 649 (6th Cir. 1964).  Yet Pratt's brief makes no effort

whatsoever to attack that finding or demonstrate any clear error.  The best

it can muster is an observation that Zacheretti did not examine comparable

sales.  Br. 29.  But that is irrelevant.  It was the *district court* that rejected all

---

[15] Moreover, if Pratt had actually charged the government non-inflated prices, GE might well have felt pressure to lower its own prices in later years.  This is yet another reason why GE's prices provide a poor mechanism for determining the "fair market value" of Pratt's engines.

of Pratt's evidence of comparable sales, based on other evidence in the record. It was only then—while citing a case about "fair market price"—that the district court turned to Zacheretti's cost-based testimony to establish fair market value. *See* RE#433 at 32446.

Given the unchallenged factual findings that there were no comparable sales, Pratt is reduced to faulting the district court (and the expert) for not accepting a different cost-based measure of value: the Air Force's "independent" estimate. Br. 29, 39. But the district court cogently and reasonably rejected the "independent" estimate because it depended on outdated and inflated cost information provided by Pratt itself. *See* RE#433 at 32444. Pratt never challenges this factual finding.

### C. The District Court Properly Credited The Government's Expert

Pratt levels several meritless factual attacks on the government's expert.

1. Pratt objects to how Zacheretti accounted for its subsequent price reductions. Pratt recognizes that Zacheretti calculated the impact those reductions had on the amount by which Pratt's fraud increased the government's final prices. Yet Pratt objects to the fact that Zacheretti did so

41

on a "pro-rata" (percentage) basis, rather than giving dollar-for-dollar credit.  Br. 35.

Pratt points to no evidence that its bottom-line, percentage-based discounts, were directed exclusively at the fraudulent costs in its Final Offer prices.  There is thus no basis to believe that Pratt's discounts reduced, dollar-for-dollar, the amount by which Pratt's inflated prices were passed on to the government.  And the evidence is directly to the contrary: Pratt's own explanation and worksheets applied the discounts across-the-board, *see* RE#443-3 at 35796 (PX114) (describing "bottom line adjustments"); *id.* at 35810 (sample bottom line "management adjustment"), supporting the expert's identical treatment.

Nor does it matter that the district court initially rejected the pro-rata approach.  This Court subsequently held that the relevant calculation was one that took the difference between the price eventually paid, and the price the government should have paid.  On remand, the district court reasonably concluded that the latter amount should not include anything attributable to fraud, RE#433 at 32446, and it credited the expert's approach to doing just that.

Moreover, by adopting the expert's approach the court properly recognized that Pratt's prices would have been "even lower" as the contract wore on if Pratt had provided honest Final Offer prices. RE#425 at 32297. After all, Pratt's non-inflated prices would have become the new baseline against which the parties negotiated in future years. If the market was even partially competitive (as Pratt agues) it was reasonable to think the government would have won the same or even greater price concessions, including as an incentive for increased volume. *Accord United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1333 (4th Cir. 1989) (falsely inflated initial proposal distorted later negotiations). Pratt's non-inflated prices also would have exerted at least some additional pressures on GE's prices in future years, in turn potentially placing pressures back on Pratt to lower prices. And if GE had not responded, then the government might well have ordered even more engines from Pratt at non-inflated prices, and at higher volume discounts—meaning that Zacheretti's calculations would *understate* the government's damages.

It does not matter that there may be some uncertainty here, since Pratt's fraud distorted the "competition" from the start and has thus "prevented a more precise computation." *Bigelow v. RKO Radio Pictures*, 327

43

U.S. 251, 264 (1946); *see also United States ex rel. Miller v. Bill Harbert Intl. Contsr., Inc.*, 608 F.3d 871, 905 (D.C. Cir. 2010) (applying this principle in a False Claims Act case); *Elyria-Lorain Broad. Co. v. Lorain Journal Co.*, 358 F.2d 790, 793 (6th Cir. 1966) ("The wrongdoer should bear the risk of the uncertainty which his own wrong has created.").  And that principle alone suffices to refute Pratt's argument.  Thus, the district court did not commit clear error in relying on Zacheretti's testimony and methodology, which inferred that Pratt would have offered at least the same percentage discounts if Pratt had started with honestly-calculated prices.

Nor did the district court shift any burden to Pratt, *cf.* Br. 36, when it said that it "presume[d] that the amount overpaid [was] equal to the fraudulent amount quoted" absent countervailing evidence, RE#433 at 32446.  The court was referring to the amounts *quoted by the expert*, whose testimony it had already adopted.  *See id.*  Thus, the district court was crediting the expert's testimony absent countervailing evidence, not shifting the burden.  And even if the court had been applying an evidentiary presumption, such presumptions are entirely consistent with a plaintiff's burden of proof.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); Fed. R. Evid. 301.

In any event, it was Pratt's burden to establish that it would not have offered the same price reductions absent its fraud. Only Pratt could know how it would have acted differently in that scenario, and the law ordinarily does not require the plaintiff to establish "facts peculiarly within the knowledge of his adversary." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 851 (2014) (internal quotation marks omitted). Pratt has failed to offer any insights into what its ultimate prices would have been if it had been truthful from the beginning.

This is fully consistent with the False Claims Act. The provision Pratt cites, *see* 31 U.S.C. § 3731(c)(2006); Br. 36, simply clarifies that the government has "the traditional civil burden of proof." S. Rep. No. 99-345, at 30-31 (1986). And that statutory provision would be irrelevant to the government's common-law damages.

Finally, even if the district court somehow erred by crediting's the expert's use of "pro-rata" reductions, Pratt would still retain substantial liability. Pratt's percentage discounts were wholly inapplicable to the first two years of the contract. *See supra* p. 8. And even if Pratt gets a dollar-for-dollar credit *on top of* the expert's damages (*i.e.*, additional credit for price reductions already built into the expert's calculation), the government's

45

damages would still be $194,833,535, before trebling and interest. *Compare* RE#397 at 30908 (second full paragraph) (providing data to calculate the dollar value of Pratt's engine price discounts, which totaled $33,147,443), *with* RE#433 at 32446 (calculation of actual damages when including pro-rata discounts, which totaled $227,980,978).

2.  Pratt contends that that the expert mistakenly dealt with a $53.6 million dollar increase in Pratt's prices, which resulted from a contract modification required by agency policy. Br. 36-37. Pratt argues that the modification had to be excluded completely from the expert's analysis, and without any record citation it claims the expert used the modification to increase damages—though it declines to identify the size of any increase, or explain how the modification affected the calculation. *Id.*

The lack of citation and explanation alone dooms Pratt's argument. *See* Fed. R. App. P. 28(a)(8)(A). So does the fact that Pratt did not raise this argument in the district court, instead electing to contend that the expert *ignored* the $53.6 million entirely, entitling Pratt to an offset in that amount. *See* RE#428 at 32363-64 (Response Brief); *Brown v. Crowley*, 312 F.3d 782, 788 (6th Cir. 2002) (arguments not timely raised in the district court are waived).

46

In any event, Pratt's argument conflicts with this Court's prior opinion.  The district court had to calculate the difference between what the government "eventually paid" and what it "should have paid."  *United Technologies*, 626 F.3d at 322.  Since the contract modification was required by policy, *see* RE#441-30 at 34726 (Section 2.d), the government both actually paid, and should have paid, any amounts attributable to that modification.  To the extent the modification caused the government to pay more using inflated prices than it would have caused the government to pay using honest prices, that difference was properly part of the government's damages since the government would have paid less in the absence of fraud.  *See also id.* (noting that the modification was an "economic price adjustment"); RE#366 at 28721-22 (Zacheretti) (such adjustments were applied pro-rata in the expert's calculation).

3.  Pratt also contends that the district court erroneously derived fair market value by subtracting the expert's damages calculation from the price the government actually paid.  Br. 30-31.  But Pratt simply misunderstands Zacheretti's testimony and how it applied to the case.

As the district court recognized, *see* RE#433 at 32446, the expert's damages calculation was never anything more than the amount by which

47

Pratt's final prices were increased by Pratt's fraudulent cost estimates. *See* RE#366 at 28702-03, 28725-27 (Zacheretti); RE#443-32 at 38019 (demonstrative referenced in testimony). Subtracting the fraudulently obtained amounts from the final prices the government actually paid thus follows this Court's remand instruction precisely.

Moreover, since the government proved that a portion of Pratt's final prices were inflated due to overstated material costs, the expert did not need to address unaffected cost categories. As a mathematical mater, those costs would drop out when calculating the *difference* between (1) the amount that the inflated material costs contributed to the final price, and (2) the amount that truthful material costs would have contributed to the final price. Regardless, the district court rejected Pratt's arguments that there were unaccounted for errors in those other cost areas, *see* RE#433 at 32447-50, and Pratt has not renewed those arguments on appeal.

### D.    The District Court Reasonably Accounted For Pratt's Warranties

As this Court previously recognized, Pratt's revised warranties had a crucial limitation. Unlike the warranties in the Final Offer, the revised warranties capped Pratt's liability. Accordingly, to the extent that Pratt

was claiming an offset for its warranty price reductions, the district court had to determine whether the Air Force had already paid for those reductions by accepting reduced protection. *United Technologies*, 626 F.3d at 322. The court concluded that the Air Force had paid in full, declining to disturb the new prices and caps that Pratt and the Air Force agreed to. RE#433 at 32451-52. Those prices carried any evidentiary burden the government had, since the sale of the actual property at issue is normally strong evidence of value in the absence of fraud or mistake. *See Kaplin*, 748 F.2d at 1111.

The court's conclusion was unsurprising. On remand, Pratt simply claimed that the newly-capped warranties were worth the original uncapped prices, even asserting that a warranty providing no more than $17.22 million in benefits was somehow worth more than $50 million. RE #426 at 32317-32322; RE #428 at 32365-66; RE #432 at 32438-39. Such valuation is unreasonable, and the district court properly rejected it.

On appeal, Pratt offers a different perspective and contends that its warranties were akin to loss leaders, as might occur with a dealer that sells a "free" warranty with its car. Br. 32-34. The argument is waived by Pratt's failure to make it on remand. *Brown*, 312 F.3d at 788.

49

The analogy is also fundamentally flawed and factually unsupported. Pratt's warranties obviously were not free, and they expressly were not linked to any engine prices. Indeed, Pratt's original offer specifically listed the engine prices "without warranty." RE#443-21 at 36972 (PX1335). And this Court correctly noted that Pratt's revised warranty prices were proposed on a "standalone basis" from any engine price discounts. *United Technologies*, 626 F.3d at 318.

Nor has Pratt cited any evidence that either (1) Pratt truthfully thought its warranty prices had a negative expected value; or (2) Pratt would not have offered the same warranty prices if its engine prices were lower. The Air Force's evaluation of GE's warranty—from a different manufacturer, at a different price, on a different engine, that had different anticipated reliability, *see* RE#443-25 at 37361 (PX1349)—certainly does not demonstrate either proposition. And neither proposition is advanced by Pratt's reliance on evidence (not cited below) that in some years the Air Force believed it was receiving a favorable deal. Br. 34. Indeed, Pratt's inflated material costs necessarily meant that the Air Force was overestimating the cost of repairing or replacing broken engines—Pratt's Final Offer justified its warranty prices by using the *same* false statements

50

and inflated cost estimates it used to justify its engine prices. RE#441-9 at 32939, 32947. Thus the Air Force's beliefs do not prove that Pratt's warranty prices were too low; they may even have been too high.

 Pratt also faults the court for accepting the negotiated warranty prices, while rejecting the negotiated engine prices. But Pratt fails to appreciate that the negotiated engine prices were an inappropriate comparator because they were indisputably inflated by fraud. By contrast, there is no indication in the record that Pratt's warranty prices were deflated by fraud.

Moreover, once Congress invalidated Pratt's original warranty prices, Congress substantially severed the link between the revised warranties and Pratt's Final Offer. Pratt further severed the link when it insisted on a different (capped) warranty. Thus, the regulatory system governing the Final Offer did not interact with Pratt's revised warranty prices in the same way that it interacted with Pratt's original engine prices. And even if Pratt's warranty prices were subject to similar upper bounds (*i.e.*, they could be no higher than expected cost plus reasonable profit), that would presumably mean that the negotiated prices were too high, not (as Pratt contends) that they were too low.

51

Finally, Pratt observes that the government's expert did not discuss warranties. Br. 31. But there was no need for him to do so. The expert's analysis allowed the district court to calculate the value of the engines. Other evidence allowed it to calculate the value of the capped warranties, and to determine whether they entitled Pratt to any offsets. Combined, the record more than supported the court's conclusions.

## II.    ISSUE PRECLUSION DOES NOT APPLY

The district court correctly determined that the government relied on the false statements in Pratt's Final Offer. As the court explained, government auditors had found major problems with Pratt's initial proposal, and they asked Pratt to address those issues in detail in its Final Offer. RE #397 at 30900-02. Pratt elected not to correct key problems, yet expressly lied about that fact in its Final Offer. *Id.* at 30900-07. The Air Force then read and relied on those false representations, concluding that Pratt's inflated Final Offer prices were fair and reasonable. RE#425 at 32292-95 (citing testimony and other evidence).

The court further found that Pratt's inflated prices continued to cause harm in later years. Each time Pratt offered "improvements," the Air Force could only except them if they were better than its existing options. *See* 32

C.F.R. § 1-1505(c)(iii) (1983).[16]   And because it did not have honest option prices in hand to use as comparators—which it would have possessed if Pratt had told the truth in its Final Offer—the Air Force agreed to "discounted" prices that were actually much "higher than it would have paid" the absence of Pratt's fraud.  RE#425 at 32292; *see also id.* at 32293; *supra* p. 14, 45-46.

Pratt contends that this reliance finding is barred by issue preclusion, given the litigation before the Board.  Br. 41-48.  But Pratt must establish that the issue decided in the earlier proceeding is "identical."  *Wolfe v. Perry*, 412 F.3d 707, 716-17 (6th Cir. 2005).  It plainly is not.

In its original decision, the Board expressly declined to evaluate the impact of Pratt's false statements in the Final Offer itself.  Instead, it accepted Pratt's argument that the Final Offer was not "cost or pricing data" for TINA's purposes; only the underlying data qualified.  *Board Initial Decision* at *64-67; *see also United Technologies*, 626 F.3d at 325 (recognizing this holding's narrowness).

---

[16] Accordingly, because the Air Force engaged in this mandated comparison, the Air Force did not perform the "cost analysis" Pratt discusses in its brief.  *See* Br. 44; RE #441-5 at 32545 (DX33).

The Board's reconsideration decision did not disturb this distinction between the underlying "cost or pricing data" and the Final Offer.  Rather, the Board explained that the Air Force did not rely on the underlying "cost or pricing data" when it accepted Pratt's Final Offer because it never reviewed that underlying data.  *Board Reconsideration Decision* at *5-6.  And the Air Force similarly did not review that data in the competition's later years, preferring instead to use an informal "market test" between Pratt and GE.  *Id.* at *9.  The Board acknowledged that during those years the government had also relied on other factors.  *See id.* at *10 (recognizing that the contracting officer "relied on [his] predecessor," as well as the official selection record created at contract acceptance, known as the "RAA").  Yet it found that reliance "without legal significance" under TINA because it was not reliance on the December 1983 cost or pricing data.  *Id.*[17]

Here, the government is not arguing that it relied on the underlying "cost or pricing data," which the Board found was never examined.  Indeed, there was little reason to sift through that data because the Air Force read and relied on Pratt's Final Offer statements (which Pratt made

---

[17]  None of these conclusions was disturbed by the Federal Circuit.  *See Wynne*, 463 F.3d at 1264-67.

54

to cover up its fraud). Because the Board's analysis of reliance never addressed that point, there is no issue preclusion.

This is hardly a "technical distinction." Br. 43. Rather, the distinction between the Final Offer and the underlying data was one that the Board itself (at Pratt's urging) accepted as crucial under TINA. And there is an obvious difference for reliance purposes between something that was read (the Final Offer) and something that was not (the underlying data).

Pratt now suggests that the Board ruled that the Air Force relied *solely* on competition during the contract's last five years. Br. 42. (Pratt apparently recognizes that the Board's "competition" finding did not apply to the first year, *see Board Reconsideration Decision* at *8-10). But the Board made no such exclusive finding, and it even acknowledged (but found legally irrelevant under TINA) that the Air Force "relied on" things in addition to competition. *Id.* at *10. Preclusion is thus inappropriate. *See Olchowik v. Sheet Metal Workers' Intl. Ass'n*, 875 F.2d 555, 558 (6th Cir. 1989) (prior finding that an action was taken for a particular reason did not preclude a finding that the action was taken for additional reasons).

Moreover, the Board never rejected the idea that the Air Force evaluated Pratt's proposed "improvements" by comparing them to the contract terms already secured.  Pratt cannot seriously argue that if it had proposed an "improvement" worse than an honestly-calculated Final Offer, the Air Force would have nonetheless accepted it under a "market test."  Indeed, regulations precluded it from doing so.  *See* 32 C.F.R. § 1-1505(c)(iii) (1983).  And that simple point accounts for the district court's reliance finding.

In any event, even if the Board had somehow concluded that the Air Force relied "solely" on competition, that finding would have been unnecessary and preclusion accordingly inappropriate.  *See Hammer v. INS*, 195 F.3d 836, 840 (6th Cir. 1999) (no preclusion for holdings that were not "necessary and essential to a judgment on the merits").  Once the Board found that the Air Force had not relied on the underlying "cost and pricing" data, it became irrelevant in that TINA proceeding whether the Air Force had affirmatively relied on anything else.

**III.** **PRATT WAS LIABLE FOR DAMAGES AND INTEREST UNDER THE COMMON LAW**

### A.    The Contract Did Not Preclude Claims For Unjust Enrichment Or Payment By Mistake

At the time the contract was signed, TINA provided that procurement contracts like this one had to contain a provision requiring a price adjustment if prices had been "increased because the contractor" provided certified "cost or pricing data which … was inaccurate, incomplete, or noncurrent."  10 U.S.C. § 2306(f)(2) (1982).  To comply with TINA, the contract incorporated by reference the language of a regulation, which essentially tracked the statute in relevant part.  *See* RE#441-22 at 34050, 34052.

The incorporated regulation stated:

> If any price … negotiated in connection with this contract … was increased by any significant sums because … the Contractor furnished cost or pricing data which was not complete, accurate and current as certified [by the Contractor] … the price or cost shall be reduced accordingly … .

32 C.F.R. § 7-104.29 (1983).  This was one of more than 100 different regulatory provisions that the contract "incorporated … by reference," as

part of a lengthy list that took up five pages of the contract. RE#441-22 at 34050, 34052.

Nothing about the statute or regulation says anything about eliminating the government's common-law remedies. On appeal, however, Pratt argues that this provision entirely precludes the government from recovering on its common-law claims for unjust enrichment and payment by mistake. Pratt's argument fails on multiple levels.

1. First, Pratt's TINA argument is waived. On remand, Pratt took the position that the government could not recover on any quasi-contractual theories because a contract existed between the parties. RE#422 at 32176-80. Pratt's filing never mentioned the TINA clause, or argued in any way that the language of this clause (or any other contract clause) had relevance to its argument. *See id.* The district court expressly noted that Pratt's omission was made despite the fact that Pratt filed an overlength brief without leave of court, and the court held Pratt to that omission. RE#425 at 32285 n.1, 32291. In these circumstances, Pratt cannot now raise on appeal the argument it declined to make before the district court. *See, e.g., Niecko v. Emro Mktng. Co.*, 973 F.2d 1296, 1299 (6th Cir. 1992) ("this court will not consider an error or issue which could have been raised below but was

not"); *Wright v. Holbrook*, 794 F.2d 1152, 1157 (6th Cir. 1986) (party could not raise new theories on appeal to support its argument).

2.  On the merits, Pratt's argument runs headlong into the rule that the government's common-law "right to recover funds, from a person who has received them by mistake and without right, is not barred unless Congress has *clearly manifested* its intention to raise a *statutory* barrier." *United States v. Wurts*, 303 U.S. 414, 416 (1938) (internal quotation marks omitted) (emphases added); *see also, e.g.*, *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 15-16 (1st Cir. 2005) ("clear congressional command" required to divest the government's right to collect "wrongfully paid monies"); *Old Republic Ins. Co. v. Federal Crop Ins. Co.*, 947 F.2d 269, 275 (7th Cir. 1991) (the government "is entitled to recover improperly paid funds unless there is an explicit statutory bar").[18]  The only potentially relevant

---

[18] *Wurts* concerns payment by mistake, one of the government's common law claims.  Because payment by mistake is closely related to unjust enrichment (the government's other common law claim), *see Tennessee ex rel. Leech v. Doles*, 749 F.2d 331, 336-37 (6th Cir. 1984), *Wurts*'s clear statement rule properly extends to unjust enrichment.  Nonetheless, this Court need not adopt that extension because the district court's common-law judgment can be fully sustained under payment by mistake.  *See* RE#425 at 32295-97 (concluding that payment by mistake "duplicates a claim for unjust enrichment" here).

statute here—TINA—is silent regarding the government's longstanding common-law rights. This hardly suffices to show an explicit congressional limit. *Accord Bechtel v. Pension Benefit Guaranty Corp.*, 781 F.2d 906, 907 (D.C. Cir. 1985) (statutory provision authorizing benefit recovery in one circumstance held not to prevent the government from exercising its common-law rights in another circumstance).

Pratt points to nothing in TINA's text or even legislative history that would alter that conclusion. Instead, Pratt appeals to cases applying state common law, and generic secondary sources, none of which involves the federal government as plaintiff. *See* Br. 49-55.[19] Such sources are not federal statutes, let alone unmistakably clear ones. Pratt's argument therefore misses the mark.

3. Pratt's argument also fails on its own terms. As Pratt acknowledges, a written contract will only bar a quasi-contract claim to the extent it governs the same subject matter. Br. 49. And while courts differ

---

[19] Pratt does cite *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603 (8th Cir. 1999), *see* Br. 49, 53-54, but that case allowed the government to bring its claim. *Applied Pharmacy*, 182 F.3d at 609.

on the language they use to articulate this principle,[20] the underlying

theory appears to be intuitive: "it is not unjust for one party to have or

retain what the other party has agreed to." *Applied Pharmacy*, 182 F.3d at

608; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 2,

cmt. c ("the parties' own definition of their respective obligations … take[s]

precedence over the obligations" imposed by law).

Against that backdrop, the TINA clause does not preclude the

government's remedies.  As Pratt successfully urged before the Board, the

Final Offer itself was not "cost or pricing data" within the meaning of the

TINA clause.  *Board Initial Decision* at *64-67.  Thus, the Board's decision

---

[20] *See, e.g., Harry W. Applegate, Inc. v. Stature Elec., Inc.*, 275 F.3d 486, 489 (6th Cir. 2001) (contract "governing a particular subject matter" precludes quasi-contract recovery "for events concerning the same subject matter") (New York law); *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 786 (8th Cir. 1996) (no bar if the express contract "does not *fully address* a subject" (emphasis added)) (Arkansas law); *Budget Mktg. v. Centronics Corp.*, 927 F.2d 421, 426 (8th Cir. 1991) (question is whether point was "*fully covered* by an express contract and in *direct conflict* therewith" (emphasis added) (internal quotation marks omitted)) (Iowa law); *Suburban Transfer Service, Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983) (no liability "if an express contract exists concerning *the identical* subject matter" (emphasis added)) (New Jersey law); *Porter v. Hu*, 169 P.3d 994, 1007 (Haw. Ct. App. 2007) (question is whether contract "fully address[es]" the injustice) (Hawaii law).  *See also* Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (displacement occurs to the extent of the contract's "scope").

was confined solely to the effect of the underlying data itself.  By contrast, and as this Court recognized, in this case "we are not concerned with Pratt's preparatory work here, only its [F]inal [O]ffer."  *United Technologies*, 626 F.3d at 323.

That distinction is significant.  Pratt's Final Offer fraud was far more damaging and important than the problems with its underlying data, since the Final Offer was what the Air Force actually examined during its final evaluation.  *See, e.g.*, RE#325 at 22601-02, 2611-13 (Wyatt)**.**  Indeed, the government had already audited Pratt's costs when evaluating the initial proposal; Pratt lied in the Final Offer precisely to cover up the fact that it declined to address all the auditors' concerns.

Pratt invokes two cases applying Illinois law, and it asserts that a contract's "subject matter" can be "'broader than the contract's specific requirements.'"  Br. 51 (quoting *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004), and citing *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985)).  But those cases are best read as standing for a more modest proposition:  if a contract authorizes one party to engage in particular conduct, the other party cannot seek unjust enrichment when exactly that conduct is

undertaken.  *See Utility Audit*, 383 F.3d at 685, 689 (contract specifically said there would be "no charge" if defendant took a particular action); *First Commodity*, 766 F.2d at 1010, 1011 (in a case where the contract authorized defendant to "terminate" the agreement for plaintiff's misbehavior, and defendant validly exercised that right, plaintiff could not seek quasi-contract remedy for injury caused by the termination).  Pratt can point to no provisions indicating that the contract here authorized it to lie in its Final Offer.

Moreover, if the cited Illinois cases did stand for a broader rule, that rule would be wrong.  Other cases properly focus on whether the relevant provision "fully address[es]" the subject matter, *Klein*, 73 F.3d at 786; was in "direct conflict" with the quasi-contract claim, *Budget*, 927 F.2d at 426; or concerns "identical" subject matter, *Suburban Transfer*, 716 F.2d at 226-27.  These cases state the correct rule because the whole point of the doctrine is to honor the parties' bargain.  To the extent that the bargain does not fully and completely address the dispute at issue—and it plainly does not here—it is inappropriate to preclude quasi-contract remedies.

That observation is especially true in this case because the relevant clause was statutorily mandated.  It is thus particularly inappropriate for

63

Pratt to concoct a hypothetical rationale for why the parties included the clause. *See* Br. 51-53. We *know* what that purpose was—the parties wanted to comply with TINA's requirements.

Moreover, there is no indication that Congress intended to preclude non-TINA remedies when it enacted TINA. And TINA can coexist harmoniously with quasi-contract recoveries, particularly since this case (unlike TINA) specifically involves fraud, and since this case (unlike TINA) does not involve reliance on "cost and pricing" data. 10 U.S.C. § 2306(f)(2) (1982). Adopting Pratt's position is tantamount to concluding that Congress, by adopting TINA, unwittingly limited the government's common-law remedies for claims that TINA does not govern.

4. Even if Pratt were correct in its understanding of the "same subject" doctrine, its argument would be defeated by that doctrine's fraud exception. This Court and others have recognized that contracts preclude quasi-contract claims only "absent fraud, bad faith, or illegality." *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 222 (6th Cir. 1992) (applying Ohio law); *see also McBride v. Boughton*, 123 Cal. App. 4th 379, 387-88 (Cal. Ct. App. 2004) (recognizing that an unjust enrichment claim is permissible, despite the parties' express contract, if the contract "was procured by

64

fraud"); *Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1226 (Ill. App. Ct. 1998) (similar). Moreover, contractual provisions are "unenforceable on grounds of public policy" if they "unreasonably exempt[] a party from the legal consequences of" its misrepresentation. Restatement (Second) of Contracts § 196.

The fraud exception fits perfectly. This Court has already described the operative contract as "fraudulently obtained," and recognized that the government's common law claims seek remedies for that fraud. *United Technologies,* 626 F.3d at 319-20, 323-24. It would turn the common law on its head if a party could obtain a contract through fraud, then use that same contract as a shield against that fraud. *A fortiori*, when the defrauded party is not just an ordinary litigant, but the United States itself, federal common law allows quasi-contract claims despite the fraud. After all, "[m]en must turn square corners when they deal with the Government," *Rock Island A & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920), and those "who seek public funds" must be "be held to the most demanding standards." *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984).

**B.    The District Court Properly Awarded Prejudgment Interest**

Pratt's final argument challenges the award of prejudgment interest. As Pratt notes, the contract incorporated a regulation stating that "all amounts that become payable by the Contractor to the Government under this contract … shall bear simple interest from the date due until paid."  32 C.F.R. § 7-104.39 (1983); *see also* RE#441-22 at 34052.  The regulation further specified that the "[a]mounts shall be due upon the earliest one of" four dates, one of which requires a "written demand."  32 C.F.R. § 7-104.39 (1983).  Pratt contends that the government never made a "written demand," precluding prejudgment interest on its common-law damages.

 As the district court aptly noted, Pratt's argument "ignores that these debts were not contractual, but rather the result of unjust enrichment and payment by mistake." RE#433 at 32453.  This reflects the commonsense notion that an award of damages for fraud-based, non-contract common law claims, based on pre-contract conduct, is not an amount "payable … under [a] contract."  Thus, it is not subject to the contract's interest clause.

Pratt identifies no cases holding otherwise.  In *North American Corp.*, the government determined that it had overpaid the contractor, then demanded payment "pursuant to" a particular contract provision it was

66

enforcing.  1984 ASBCA LEXIS 603, at *8, *10-11 (A.S.B.C.A. 1984).

Similarly, in *Electronics & Space Corp.*, the government's demands were

made under a contract provision that required the contractor to "pay the

amount of" a particular kind of overpayment "upon demand."  1995

ASBCA LEXIS 171, at *5 (A.S.B.C.A. 1995).  Here, of course, the government

is not invoking any contractual provision as the source of Pratt's

repayment obligation.  Rather, the recovery stems from the common law in

light of pre-contract fraud.

Furthermore, while Pratt claims that the parties' contract "governs

prejudgment interest," Br. 55, the relevant provision says nothing about

judgments at all.  Instead, it applies to "amounts that become payable by

the Contractor to the Government under this contract."  32 C.F.R. § 7-104.39

(1983).  Given that glaring textual omission, there is no reason to think it

was intended to apply to prejudgment interest on damages awarded to the

government when it prevails on common law claims (and especially claims

related to pre-contract fraud).  It is one thing to limit the government's

interest when an amount becomes payable by the contractor under the

contract—perhaps through no fault of the contractor.  It is quite another to

say that, by incorporating this clause, the government meant to limit its

ability to recover interest in situations when it must sue the contractor and obtain a judgment for pre-contract fraud.

Indeed, "prejudgment interest" on an award of damages "'is an element of [plaintiff's] complete compensation,'" *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (quoting *West Virginia v. United States*, 479 U.S. 305, 310 & n. 2 (1987) (alteration in original)), and "serves to 'remedy the injury giving rise to the [underlying] action.'" *Pogor v. Makita U.S.A.*, 135 F.3d 384, 387 (6th Cir. 1998) (quoting *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988) (alteration in original)).  That remedy thus properly applies unless validly abrogated, and Pratt has offered no basis to conclude that the interest clause was meant to limit the government's ability to recover "complete compensation" or to "remedy the injur[ies]" it suffered.

That conclusion is reinforced by the structure of the Contract Disputes Act.  Under that Act, only a contracting officer can issue a demand under the contract.  *See* 41 U.S.C. § 605(a) (1982) ("All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer.").  But claims "involving fraud" are beyond the jurisdiction of the agency or the contracting officer. *Id.*; *see also United Technologies*, 626 F.3d at 324 ("[E]very court that has

68

considered the issue has determined that contracting officers and administrative boards do not have jurisdiction over claims involving fraud"). Because, the government's common law claims in this case involve fraud, *id.* at 323, the only official that arguably could have made a demand under the contract's interest clause was prohibited from doing so. Pratt's interpretation would thus lead to the paradoxical conclusion that the government could obtain interest for ordinary contract violations in Board proceedings, but could not do so in cases involving fraud that must be brought in district court. The contract's interest clause surely was not intended to tie the government's hands in this matter.

Finally, for the first time on appeal, Pratt invokes allegations in the operative complaint stating that the government "overpaid defendant under the [parties'] Contract." RE#334 at 23739; *see also* Br. 56, 57; *cf.* RE#428 at 32366-68. This misses the point. Payments *to Pratt* were paid under the contract. But when the government obtained a damages award *against* Pratt, based on the common law, it did not rely on the contract. And the interest clause only governed "amounts that become payable *by the Contractor to the Government* under this contract." 32 C.F.R. § 7-104.39 (1983) (emphasis added).

69

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

STUART F. DELERY
  *Assistant Attorney General*

CARTER M. STEWART
  *United States Attorney*

ALAN S. GALE
  *Attorney, Civil Division*

MICHAEL S. RAAB
**/s/ Benjamin M. Shultz**
BENJAMIN M. SHULTZ
  *(202) 514-3518*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

APRIL 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Book Antiqua, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **13,992 words**, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii) and this Court's local rules, according to the count of Microsoft Word.

/s/ Benjamin M. Shultz
BENJAMIN M. SHULTZ

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2014, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Benjamin M. Shultz
BENJAMIN M. SHULTZ

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS
## UNDER 6TH CIR. RULE 30(g)(1)

The United States hereby designates the following portions of the

district court record for this Court's consideration:

| Description | Record Entry# | Page ID# Range |
|---|---|---|
| Armed Services Procurement Regulation (excerpt), Aug. 1, 1978 (DX33) | 441-5 | 32543-32545 |
| Hearings Before The H. Subcomm. On Appropriations, Feb. 15, 1983 (DX4) | 441-2 | 32483-32495 |
| Hearings On H.R. 2287 Before The H. Comm. On Armed Services, Mar. 1-Apr. 28, 1983 (DX11) | 441-3 | 32496-32518 |
| Request For Proposal, May 19, 1983 (PX1048) | 443-5 to 443-12 | 35841-36770 |
| Pratt & Whitney's Initial Proposal (Volume VI), Aug. 17, 1983 (PX2003D) | 443-26 to 443-31 | 37363-38005 |
| Audit Report No. 4D210901, Oct. 20, 1983 (PX1314) | 443-20 | 36898-36907 |
| Contractor Inquiry, Nov. 11, 1983 (PX1071A) | 441-13 | 36771-36794 |
| Request For Best And Final Offer, Nov. 19, 1983 (PX410) | 443-4 | 35817-35840 |
| Pratt & Whitney's Best And Final Offer ("Final Offer"), Dec. 5, 1983 (DX154) | 441-9 to 441-13 | 32903-33348 |
| Final Offer Appendix A – Engine Warranty And VIQ Data, Dec. 5, 1983 (PX1335) | 443-21 to 443-24 | 36908-37360 |
| Alternate Fighter Engine Source Selection Estimate, 1983 (undated) (DX131) | 443-1 | 35377-35792 |
| Air Force Record Of Acquisition Action, Dec. 23, 1983 (PX1079) | 443-14 | 36795-36811 |
| Memo For The Record, Jan. 6, 1984 (PX1087) | 443-15 | 36812-36814 |
| Contract F33657-84-C-2014 (excerpts), Feb. 3, 1984 (DX288) | 441-15 to 441-29 | 33356-34725 |
| Source Selection Decision, Feb. 3, 1984 (PX1349) | 443-25 | 37361-37362 |

| Description | Record Entry# | Page ID# Range |
|---|---|---|
| Hearings On H.R. 5167 Before The H. Comm. On Armed Services, Mar. 7-29, 1984  (DX19) | 441-4 | 32519-32542 |
| Letter From Gary D. Hansman, Contracting Officer, To Pratt & Whitney, Sep. 17, 1984 (DX306) | 441-30 | 34726-34727 |
| Letter From Pratt & Whitney To Gary D. Hansman, Contracting Officer, Nov. 1, 1984 (PX1114) | 443-17 | 36817-36821 |
| Memo For The Record, Sep. 23, 1985 (DX303) | 443-2 | 35793-35795 |
| Letter From Pratt & Whitney To Peter R. Crowe, Defense Contract Audit Agency, Apr. 3, 1991 (PX114) | 443-3 | 35796-35816 |
| Price Reduction Analysis, Mar. 30, 1993 (PX1499) | 441-44 | 35341 |
| Memorandum Re: Profit On Contract F33657-84-C-2014, Aug. 23, 1994 (PX1192) | 443-18 | 36822 |
| Defense Contract Audit Agency, Supplemental Audit Report, June 20, 1997 (PX1196) | 443-19 | 36823-36897 |
| Transcript Of Proceedings, Oct. 12, 2004 | 330 | 23202-23441 |
| Transcript Of Proceedings, Oct. 13, 2004 | 325 | 22429-22638 |
| Transcript Of Proceedings, Oct. 21, 2004 | 344 | 24612-24781 |
| Transcript Of Proceedings, Oct. 25, 2004 | 346 | 24956-25145 |
| Transcript Of Proceedings, Oct. 27, 2004 | 348 | 25335-25521 |
| Transcript Of Proceedings, Nov. 4, 2004 | 352 | 26059-26232 |
| Transcript Of Proceedings, Nov. 9, 2004 | 354 | 26409-26604 |
| Transcript Of Proceedings, Nov. 18, 2004 | 356 | 26858-27015 |
| Transcript Of Proceedings, Nov. 22, 2004 | 357 | 27016-27156 |
| Transcript Of Proceedings, Dec. 9, 2004 | 363 | 28038-28275 |
| Transcript Of Proceedings, Dec. 10, 2004 | 364 | 28276-28452 |
| Transcript Of Proceedings, Dec. 14, 2004 | 365 | 28453-28694 |
| Transcript Of Proceedings, Dec. 15, 2004 | 366 | 28695-28880 |
| Demonstrative Regarding Total Damages, Used During Testimony On Dec. 15, 2004 | 443-32 | 38006-38058 |
| Third Amended Complaint, Dec. 18, 2004 | 334 | 23714-23742 |

| Description | Record Entry# | Page ID# Range |
|---|---|---|
| District Court's Findings Of Fact And Conclusions Of Law, Aug. 1, 2008 | 397 | 30896-30918 |
| United States' Reply Brief Regarding Proposed Schedule On Remand, June 17, 2011 | 417 | 32057-32079 |
| Pratt's Response Brief On Common Law Claims, Oct. 21, 2011 | 422 | 32168-32230 |
| District Court's Opinion Finding Defendant Liable For Payment By Mistake And Unjust Enrichment, June 6, 2012 | 425 | 32283-32289 |
| Pratt's Brief On Damages, Sep. 14, 2012 | 426 | 32299-32323 |
| Pratt's Response Brief On Damages, Oct. 5, 2012 | 428 | 32345-32369 |
| Pratt's Reply Brief On Damages, Oct. 26, 2012 | 432 | 32417-32440 |
| District Court's Findings Of Fact And Conclusions Of Law, June 17, 2013 | 433 | 32441-32457 |
| District Court's Judgment, July 1, 2013 | 435 | 32464 |
| Notice Of Appeal, Aug. 26, 2013 | 436 | 32465-32467 |

**ADDENDUM**

# ADDENDUM CONTENTS

Item                                                                    Page

10 U.S.C. § 2306 (1982) (excerpts) ............................................................... A1

31 U.S.C. § 3732(c) (2006) ........................................................................... A3

41 U.S.C. § 605(a) (1982) ............................................................................. A4

32 C.F.R. § 1-1505 (1983) (excerpts) ........................................................... A5

32 C.F.R. § 7-104.29 (1983) ......................................................................... A7

32 C.F.R. § 7-104.39 (1983) ......................................................................... A9

32 C.F.R. § 16-206.1 (1983) ........................................................................ A10

**10 U.S.C. § 2306 (1982) (excerpts)**

(a) The cost-plus-a-percentage-of-cost system of contracting may not be used. Subject to this limitation and subject to subsections (b)-(f), the head of an agency may, in negotiating contracts under section 2304 of this title, make any kind of contract that he considers will promote the best interests of the United States.

. . .

(f)(1) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current-

    (A) prior to the award of any negotiated prime contract under this title where the price is expected to exceed $500,000;

    (B) prior to the pricing of any contract change or modification for which the price adjustment is expected to exceed $500,000, or such lesser amount as may be prescribed by the head of the agency:

    (C) prior to the award of a subcontract at any tier, where the prime contractor and each higher tier subcontractor have been required to furnish such a certificate, if the price of such subcontract is expected to exceed $500,000; or

    (D) prior to the pricing of any contract change or modification to a subcontract covered by clause (C), for which the price adjustment is expected to exceed $500,000, or such lesser amount as may be prescribed by the head of the agency.

(2) Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or noncurrent: Provided, That the requirements of this subsection need not be applied to contracts or subcontracts where the

price negotiated is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, prices set by law or regulation or, in exceptional cases where the head of the agency determines that the requirements of this subsection may be waived and states in writing his reasons for such determination.

(3) For the purpose of evaluating the accuracy, completeness, and currency of cost or pricing data required to be submitted by this subsection, any authorized representative of the head of the agency who is an employee of the United States Government shall have the right, until the expiration of three years after final payment under the contract or subcontract, to examine all books, records, documents, and other data of the contractor or subcontractor related to the negotiation, pricing, or performance of the contract or subcontract.

. . .

**31 U.S.C. § 3732(c) (2006)**

(c) In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

**41 U.S.C. § 605(a) (1982)**

(a) Contractor claims

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall Inform the contractor of his rights as provided in this chapter. Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding. The authority of this subsection shall not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine. This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

**32 C.F.R. § 1-1505 (1983) (excerpts)**

. . .

(c) Options should be exercised only if it is determined that:
(i) funds are available;
(ii) the requirement covered by the option fulfills an existing need of the
Government. A Foreign Military Sales (FMS) commitment undertaken
by the United States Government on behalf of a foreign
country constitutes such need. However, in the latter case, the contract
shall expressly provide for the Government's right to exercise
the option for FMS purposes (see 1-1503(e) and 6-1309); and
(iii) the exercise of the option is the most advantageous method of fulfilling
the Government's need, price, and factors in (e) and (f) below
considered.

(d) Insofar as price is concerned, the determination under (c)(iii) above
shall be made on the basis of one of the following.
(1) A new solicitation fails to produce a better price than that offered by
the option. If the contracting officer anticipates that the option price will be
the best price available, he should not use this method of testing the market
but should use one of the methods in (2), (3), or (4) below.
(2) An informal investigation of prices, or other examination of the market,
indicates clearly that a better price than that offered by the option cannot
be obtained (see 1-309).
(3) The time between the award of the contract containing the option and
the exercise of the option is so short that it indicates the option price is the
lowest price obtainable, considering such factors as market stability and a
comparison of the time since award with the usual duration of contracts for
such supplies or services.
(4) Established prices are readily ascertainable and clearly indicate that a
new solicitation can obviously serve no useful purpose.

(e) The determination under (c)(iii) above should, among other things, take
into account the Government's need for continuity of operations and
potential costs to the Government of disrupting operations, including the
cost of relocating necessary Government-furnished equipment (as, for

example, in certain repair and overhaul contracts for aircraft or other complex equipment).

(f) Insofar as factors other than price were considered for award of an originally negotiated procurement (see 3-501(b)(3)Sec. M(i)), and are therefore for consideration in exercising the option, the determination under (c)(iii) above shall be made on the basis of one of-the following.

(1) A new solicitation fails to produce a more advantageous offer than that offered by the option. If the contracting officer anticipates that the option will be the most advantageous offer, he should not use this method of testing the market but should use one of the methods in (2) or (3) below.

(2) An informal investigation of the market indicates clearly that a more advantageous offer than that offered by the option cannot be obtained, and that a new solicitation would obviously serve no useful purpose (see 1-309).

(3) The time between the award of the contract containing the option and the exercise of the option is so short that it indicates clearly that the option is the most advantageous offer obtainable, considering such factors as changes in relative technical merit of the contractor and competitors, market stability, and a comparison of the time since award with the usual duration of contracts for such supplies or services.

. . .

**32 C.F.R. § 7-104.29 (1983)**

(a) The following clause shall be inserted in negotiated contracts which when entered into exceed $300,000, except where the price is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulation. In addition the contracting officer shall include this clause in other negotiated contracts for which he has obtained a Certificate of Current Cost or Pricing Data in accordance with 3 807.3(b)(iii) in connection with the initial pricing of the contract, or for which he has obtained partial cost or pricing data in accordance with 3-807.3(d).

PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (1970 JAN)

If an price, including profit or fee, negotiated in connection with this contract or any cost reimbursable under this contract was increased by any significant sums because:

(i) the Contractor furnished cost or pricing data which was not complete, accurate and current as certified in the Contractor's Certificate of Current Cost or Pricing Data;

(ii) a subcontractor, pursuant to the clause of this contract entitled "Subcontractor Cost or Pricing Data" or "subcontractor Cost or Pricing Data-Price Adjustments" or any subcontract clause therein required, furnished cost or pricing data which was not complete, accurate and current as certified in the subcontractor's Certificate of Current Cost or Pricing Data;

(iii) a subcontractor or prospective subcontractor furnished cost or pricing data which was required to be complete, accurate and to be submitted to support a subcontract cost estimate furnished by the Contractor but which was not complete, accurate and current as of the date certified in the Contractor's Certificate of Current Cost or Pricing data; or

(iv) the Contractor or a subcontractor or a prospective subcontractor furnished any data not within (i), (ii) or (iii) above, which was not accurate as submitted;

the price or cost shall be reduced accordingly and the contract shall be modified in writing as may be necessary to reflect such reduction. However, any reduction in the contract price due to defective subcontract data of a prospective subcontractor when the subcontract was not subsequently awarded to such subcontractor, will be limited to the amount (plus applicable overhead and profit markup) by which the actual subcontract, or actual cost to the Contractor if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor, *provided* the actual subcontract price was not affected by defective cost or pricing data.

Note: Since the contact is subject to reduction under this clause by reason of defective cost or pricing data submitted in connection with certain subcontracts, it is expected that the contractor may wish to include a clause in each such subcontract requiring the subcontractor to appropriately indemnify the contractor.  However, the inclusion of such a clause and the terms thereof are matters for negotiation and agreement between the contractor and the subcontractor, *provided* that they are consistent with ASPR 23-203 relating to Disputes provisions in subcontracts.  It is also expected that any subcontractor subject to such indemnification will generally require substantially similar indemnification for defective cost or pricing data required to be submitted by his lower tier subcontractors.

**32 C.F.R. § 7-104.39 (1983)**

In accordance with E-620, insert the following clause:

INTEREST (1983 FEB)

Notwithstanding any other provision of this contract, unless paid within 30 days all amounts that become payable by the Contractor to the Government under this contract (net of any applicable tax credit under the Internal Revenue Code) shall bear simple interest from the date due until paid and shall be subject to adjustments as provided by Part 6 of Appendix E of the Defense Acquisition Regulation, as in effect on the date of this contract. The interest rate shall be the rate, established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as herein provided, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid. Amounts shall be due upon the earliest one of (i) the date fixed pursuant to this contract; (ii) the date of the first written demand for payment, consistent with this contract, including demand consequent upon default termination; (iii) the date of transmittal by the Government to the Contractor of a proposed supplemental agreement to confirm completed negotiations fixing the amount; or (iv) if this contract provides for revision of prices, the date of written notice to the Contractor stating the amount of refund payable in connection with a pricing proposal or in connection with a negotiated pricing agreement not confirmed by contract supplement.

**32 C.F.R. § 16-206.1 (1983)**

(a) The DD Form 633 shall be used, except for negotiated final overhead rates and termination settlements, whenever cost or pricing data (see 3-807.7) is required. The data requirement, in 3-807 and 7-104.42, is in connection with the pricing of contracts, subcontracts (including prospective subcontracts), and changes or modifications to contracts or subcontracts. In accordance with the provisions of 3-807.7(b), the DD Form 633-7 shall be submitted whenever exemption from such cost or pricing data requirements is claimed for contracts or subcontracts by reason of established catalog or market prices (see 3-807.7(b)) or prices set by law or regulation.

(b) The purpose of DD Form 633 is to provide a vehicle whereby the offeror submits to the Government a pricing proposal of estimates and/or incurred costs by contract line item with supporting information, adequately crossreferenced, suitable for detailed analysis. Supporting cost element breakdowns must be obtained for each proposed line item. When more than one contract line item is proposed, summary total amounts, by cost element, covering all proposed line items, should also be obtained.

(c) When Contract Cost Data Reports arc required  by the purchase request, the contractor shall be required to submit DD Forms 1921 and/or 1921-1 to support the DD Form 633. The DD Forms 1921 shall be prepared in accordance with the Contractor Cost Data Reporting (CCDR) System (Army - AMCP 715-8, Navy - NAVMAT P5241, and Air Force - AFLCP/AFSCP 800-15). The contractor supporting data shall be prepared in such a manner as to support each cost element on the DD Form 1921-1.

(d) DD Form 783 (Royalty Report (Foreign and Domestic)) is approved for use as the separate schedule required by DD Form 633.