## No. 13-4057

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

―――――――――――――――――――

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### UNITED TECHNOLOGIES CORPORATION,

*Defendant-Appellant.*

―――――――――――――――――――

Appeal from the United States District Court for the Southern District of Ohio

―――――――――――――――――――

## REPLY BRIEF FOR APPELLANT

―――――――――――――――――――

Jeffrey A. Hall
BARTLIT BECK HERMAN
   PALENCHAR & SCOTT LLP
54 W. Hubbard Street
Chicago, IL  60610
(312) 494-4400

David Z. Bodenheimer
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 624-2500

Lori Alvino McGill
QUINN EMANUEL URQUHART
   & SULLIVAN LLP
777 Sixth Street, NW, 11th Floor
Washington, DC  20001
(202) 538-8210

Gregory G. Garre
   *Counsel of Record*
Edward J. Shapiro
Jonathan Y. Ellis*
Benjamin W. Snyder*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2207
gregory.garre@lw.com

*Not licensed to practice in the District of Columbia.  All work supervised by a member of the D.C. Bar.

*Counsel for Appellant United Technologies Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 4

I.  THE DISTRICT COURT'S DAMAGES AWARD CANNOT
    STAND ............................................................................................. 4

    A.  The Government's Methodology Amounts To A Collateral
        Attack On This Court's Damages Mandate .......................... 4

    B.  The Government's Arguments For Dispensing With A Genuine
        Market-Based Analysis Of Damages Lack Merit ................. 6

        1.  Regulatory scheme. ................................................... 6

        2.  Comparable sales. .................................................... 10

        3.  Supposed taint. ........................................................ 12

    C.  The Government Has Failed To Meet Its Burden To Prove
        Damages Under The Methodology Mandated By This Court ........... 14

        1.  Zacheretti's damages calculation was not based on fair
            market value. ............................................................ 15

        2.  The government offered no evidence of the fair market
            value of Pratt's warranties. ..................................... 18

        3.  Because the government has failed to carry its burden of
            proving damages, it is entitled to none. ................... 20

II.  THE DISTRICT COURT ERRED IN FAILING TO GIVE
     PRECLUSIVE EFFECT TO THE BOARD'S RELIANCE
     FINDINGS ...................................................................................... 22

III. THE DISTRICT COURT ERRED IN AWARDING DAMAGES
     AND PREJUDGMENT INTEREST UNDER QUASI-CONTRACT .......... 24

    A.  Quasi-Contract Is Unavailable Because The Contract Addressed
        The Subject Matter Of False Statements About Cost ......... 24

**Page**

B.    The "Fraud Exception" Does Not Save The Government's Claims ................................................................................. 26

C.    The Government's Waiver And Clear Statement Arguments Fail ............................................................................................ 27

D.    The Government Is Not Entitled To Prejudgment Interest ................. 28

CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ab-Tech Construction, Inc. v. United States*,
  31 Fed. Cl. 429 (1994) ..................................................................21

*Budget Marketing, Inc. v. Centronics Corp.*,
  927 F.2d 421 (8th Cir. 1991) ........................................................26

*Chapman Glen Ltd. v. Commissioner*,
  140 T.C. 294 (2013)......................................................................15

*Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.*,
  516 N.E.2d 190 (N.Y. 1987).........................................................26

*Daff v. United States*,
  31 Fed. Cl. 682 (1994) ..................................................................30

*Estate of Gaither v. District of Columbia*,
  655 F. Supp. 2d 69 (D.D.C. 2009).................................................22

*Foreman Industries, Inc.*,
  No. 23948, 80-2 BCA ¶ 14,501, 1980 ASBCA LEXIS 336 .............29

*Friedman v. New York City Administration for Children's Services*,
  502 F. App'x 23 (2d Cir. 2012) .....................................................22

*Gross v. Commissioner*,
  272 F.3d 333 (6th Cir. 2001) ...........................................................5

*Grumman Aerospace Corp. v. Wynne*,
  497 F.3d 1350 (Fed. Cir. 2007) .....................................................29

*Harry W. Applegate, Inc. v. Stature Electric, Inc.*,
  275 F.3d 486 (6th Cir. 2001) ........................................................24

*Kaufman v. Seidman*,
  984 F.2d 182 (6th Cir. 1993) ........................................................22

**Page(s)**

*Klein v. Arkoma Production Co.*,
    73 F.3d 779 (8th Cir. 1996) ....................................................26

*McCann Holdings, Ltd. v. United States*,
    111 Fed. Cl. 608 (Fed. Cl. 2013) ...........................................10

*Montana v. United States*,
    440 U.S. 147 (1979)...............................................................22

*Noel v. Fleet Finance, Inc.*,
    971 F. Supp. 1102 (E.D. Mich. 1997) ...................................26

*North American Corp.*,
    ASBCA No. 28140, 84-2 BCA ¶ 17,286, 1984 ASBCA LEXIS 603...............29

*Piney Woods Country Life School v. Shell Oil Co.*,
    726 F.2d 225 (5th Cir. 1984) .................................................10

*Rodriguez-Garcia v. Miranda-Marin*,
    610 F.3d 756 (1st Cir. 2010)..................................................23

*Suburban Transfer Service, Inc. v. Beech Holdings, Inc.*,
    716 F.2d 220 (3d Cir. 1983) ..................................................26

*Syverson v. IBM Corp.*,
    472 F.3d 1072 (9th Cir. 2007) ...............................................22

*United States v. 0.376 Acres of Land*,
    838 F.2d 819 (6th Cir. 1988) .................................................15

*United States v. 50 Acres of Land*,
    469 U.S. 24 (1984)...........................................................11, 12

*United States v. 103.38 Acres of Land*,
    660 F.2d 208 (6th Cir. 1981) .................................................10

*United States v. 320.0 Acres of Land*,
    605 F.2d 762 (5th Cir. 1979) .................................................10

**Page(s)**

*United States v. Abbey*,
    560 F.3d 513 (6th Cir. 2009) ...............................................................15

*United States v. Advance Tool Co.*,
    902 F. Supp. 1011 (W.D. Mo. 1995) .....................................................21

*United States v. Applied Pharmacy Consultants, Inc.*,
    182 F.3d 603 (8th Cir. 1999) ...............................................................28

*United States v. Barr*,
    617 F.3d 370 (6th Cir. 2010) .................................................................5

*United States v. Cartwright*,
    411 U.S. 546 (1973).................................................................................9

*United States v. Commodities Trading Corp.*,
    339 U.S. 121 (1950).................................................................................2

*United States v. EER Systems Corp.*,
    950 F. Supp. 130 (D. Md. 1996)...........................................................25

*United States v. Killough*,
    848 F.2d 1523 (11th Cir. 1988) ...........................................................4, 5

*United States v. Science Applications International Corp.*,
    555 F. Supp. 2d 40 (D.D.C. 2008)........................................................25

*United States v. Sosebee*,
    419 F.3d 451 (6th Cir. 2005) .................................................................5

*United States v. United Technologies Corp., Sikorsky Aircraft Division*,
    51 F. Supp. 2d 167 (D. Conn. 1999)....................................................25

*United States v. United Technologies Corp.*,
    626 F.3d 313 (6th Cir. 2010) .........................................1, 4, 14, 19

*United States v. Wurts*,
    303 U.S. 414 (1938)...............................................................................29

**Page(s)**

*United States ex rel. Campbell v. Lockheed Martin Corp.*,
282 F. Supp. 2d 1324 (M.D. Fla. 2003)............................................................25

*United States ex rel. Taxpayers Against Fraud v. Singer Co.*,
889 F.2d 1327 (4th Cir. 1989) ................................................................12, 13

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004) ..........................................................................8

*United Technologies Corp.*,
ASBCA No. 51410, 04-1 BCA ¶ 32,556,
2004 ASBCA LEXIS 15..............................................8, 14, 17, 23, 27

*United Technologies Corp.*,
ASBCA No. 51410, 05-1 BCA ¶ 32,860, 2005 ASBCA LEXIS 10............14, 23

*Wynne v. United Technologies Corp.*,
463 F.3d 1261 (Fed. Cir. 2006) ......................................................................23

*Yee v. City of Escondido*,
503 U.S. 519 (1992)..........................................................................................27

## STATUTES AND REGULATIONS

10 U.S.C. § 2306(f) (1982) ............................................................................7, 27

41 U.S.C. § 605(a) (1982)....................................................................................29

32 C.F.R. § 16-206.1(b) (1983) ..........................................................................9

## OTHER AUTHORITIES

H.R. Rep. No. 99-1001 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6529 .................27

Robert Reilly & Manoj Dandekar, *Complexities Involved in Valuing
Tangible Personal Property*, 4 Valuation Strategies 36 (2001) ........................16

## INTRODUCTION

As is evident from the very first sentence of its brief, the government wants to keep talking about "fraud."  But the question in this appeal is not whether Pratt & Whitney (Pratt) made false statements.    Pratt has acknowledged the misstatements, and it will pay the maximum statutory penalty for them.    The question here is whether the government has proved that it was *actually damaged* by those misstatements under the "fair market value"-based damages methodology this Court ordered in the prior appeal.    Ultimately, the government's repeated rhetoric about fraud is just one of many signs that it has not met, and cannot meet, its burden in proving that it sustained actual damages.

Ever since this Court's decision in the prior appeal, the government has waged a collateral attack on this Court's damages methodology.    This Court instructed the District Court to calculate damages, if any, based on a common-sense, "fair market value" approach—*i.e.,* to calculate the difference between (1) "what the government eventually paid each year," and (2) "the fair market value of the goods the government received" (*i.e.*, what it "should have paid").    *United States v. United Techs. Corp.*, 626 F.3d 313, 322 (6th Cir. 2010).  Yet, on remand, the government convinced the District Court to dispense with conventional measures of fair market value (like comparable sales) and assess damages by attempting to re-engineer the prices Pratt would have offered in 1983—if it had not

made any false statements—by adjusting one component of Pratt's estimated costs. In doing so, the government relied solely on testimony (Dannie Zacheretti's) that not once mentioned "fair market value" and was submitted *before* this Court's opinion. Now the government seeks to transform Zacheretti's subjective re-engineering of an offer he supposes Pratt would have made in 1983 into an objective, *market*-based measure of 1985-90 prices. That effort fails.

Indeed, the government strains so hard to avoid a fair-market-value analysis that it argues that (1) a market-based analysis of Pratt's engines is barred by a 1950 case concerning a *wartime price ceiling* for pepper, *United States v. Commodities Trading Corp.,* 339 U.S. 121 (1950); (2) the very engines against which Pratt's engines competed for the same contract, subject to the same performance requirements, to propel the same fighter jets, are not amenable to a "comparable sales" analysis; and (3) the false statements underlying Pratt's unsuccessful effort to avoid a split award in 1983 *forever* taint the fiercely competitive rounds of bidding that ensued over the next six years. Those extreme arguments are unavailing. This Court got it exactly right when it called for a "fair market value"-based assessment. The problem for the government is that neither it nor the District Court—which simply adopted the government's subjective re-engineering methodology wholesale—even attempted a fair-market-value analysis.

The government's failure to prove actual damages is a sufficient reason to put an end to this long-running case. But the government has also failed to answer the additional grounds for reversal identified by Pratt. On issue preclusion, the government advances an unduly restrictive "identicality" test in an attempt to avoid the Board's finding that the Air Force relied on competition—and not other factors—in making the contract awards. But issue preclusion attaches where, as here, the issues are at least "substantially similar." And on quasi-contract, the government again tries to recast the governing standard, arguing that a contract may displace quasi-contract remedies only where it *expressly authorizes* the particular conduct at issue. But quasi-contract is displaced whenever the contract covers the "subject matter" of the dispute—a test readily satisfied here.

The judgment of the District Court should be reversed. Pratt will pay a statutory penalty of more than $7 million for making false statements. But the government failed to prove that it sustained any actual damages. To the contrary, ample evidence in the record on fair market value reveals that the government did not pay more than it should have paid for the engines and warranties.

## ARGUMENT

## I.    THE DISTRICT COURT'S DAMAGES AWARD CANNOT STAND

### A.    The Government's Methodology Amounts To A Collateral Attack On This Court's Damages Mandate

In a broad sense, the damages issue boils down to whether this Court meant what it said in the prior appeal—and whether the government must be held to the standard this Court prescribed.  This Court directed the District Court to determine the government's damages, if any, by calculating the difference between (1) what the government "paid each year" and (2) what it "should have paid" based on "the fair market value of the fighter jet engine contract."  626 F.3d at 322.

That mandate resolved a contested point of law.  Pratt had argued that damages should be measured based on the "fair market value … of the goods or services provided."  UTC 2009 Response Br. 53-55 (quoting *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988)).  The government had argued that the "supposed market value" of Pratt's engines would not redress its alleged harm, and that the "way to measure the Government's damages" was the re-engineered offer Zacheretti had produced, which purportedly "determine[d] how much more Pratt's original [1983 offer] engine prices were than if Pratt had calculated them using the cost data and methods Pratt represented."  US 2009 Reply Br. 43-44. This Court adopted the "fair market value" approach.  626 F.3d at 322.

4

We presume the Court meant what it said. As even the government recognizes (at 38), "fair market value" ordinarily refers to the price a "willing buyer" would pay a "willing seller" for a good. *Gross v. Commissioner*, 272 F.3d 333, 342 (6th Cir. 2001); *see also United States v. Barr,* 617 F.3d 370, 375 (6th Cir. 2010); *United States v. Sosebee,* 419 F.3d 451, 456 (6th Cir. 2005). That price is typically assessed by appraisers using techniques like comparable sales. UTC Br. 28. The government itself has followed that accepted meaning in arguing damages in other False Claims Act cases. *E.g., Killough,* 848 F.2d at 1531.

Nevertheless, as soon as this case returned to the District Court on remand, the government took the remarkable position that this Court used "fair market value" only "in the sense of a recalculated price that did not include any cost overestimates or cost underestimates." RE415 at 32029 (US Statement on Scope of Remand). More candidly, the government argued: "**The Sixth Circuit Did Not Adopt A Fair Market Value Measure Of Damages.**" RE417 at 32072 (US Reply on Scope of Remand); *see id.* at 32072-73. The government now protests that it "did not urge the district court to disregard 'fair market value,'" and claims that Pratt quoted the above language from its brief "out of context." US Br. 35-36 n.14. But the government's briefs speak for themselves and the quoted language is a *heading* in the government's brief on the scope of this Court's remand.

5

The government insists the District Court considered "fair market value." But what it means is that the court adopted the government's *redefinition* of that term, which strips the term of its accepted meaning and—presto!—transforms it into Zacheretti's re-engineered 1983 offer prices. *See* US Br. 28-29; RE415 at 32029 (US Statement on Scope of Remand). There is no basis to conclude that this Court intended "fair market value" to have such a contrived meaning.

### B. The Government's Arguments For Dispensing With A Genuine Market-Based Analysis Of Damages Lack Merit

No doubt recognizing that its methodology deviates starkly from a fair-market-value approach, the government now offers several arguments for dispensing with a conventional fair-market-value analysis. Each lacks merit.

#### 1. *Regulatory scheme.*

Invoking *United States v. Commodities Trading Corp.*—a 1950 case involving a wartime price ceiling for pepper—the government's principal reason for abandoning a conventional market-based analysis is the "regulatory structure" of the fighter-engine market. US Br. 28-32. But the government fundamentally mischaracterizes the regulatory environment in which the Air Force conducted the Fighter Engine Competition (FEC). This case does not involve anything like a price control. Indeed, here the Air Force and underlying regulations relied on *competition* to set price. The government ignores that central market feature.

Regulation does not inexorably displace a competitive market—and it demonstrably did not do so here. As Secretary Orr explained to Congress, "we are going to have a competition in the engines. We are going to have two fine manufacturers who are going to be at each other's throats." RE441-2 at 32489 (DX4). That there was only one buyer—the United States government—only intensified that competition. UTC Br. 26. Today the procurement is known as the "Great Engine War." And price was a crucial front in that war. *See, e.g.*, RE443-5 at 35902 (Request for Proposal) ("Price and other factors will be considered in determining the contract award(s) ...."); UTC Br. 5-10.

The government's claim (at 3) that there was no "*price* competition" defies reality. This argument is based solely on the contracting officer's 1983 determination—before any award—that there would not be "adequate price competition" to forego the requirements of the Truth in Negotiations Act (TINA). US Br. 3-4, 15, 30. But that is simply a procedural determination that requires competitors to *submit* "cost or pricing data" along with their bids to help the Air Force evaluate their prices. *See* 10 U.S.C. § 2306(f) (1982); RE441-5 at 32551 (Defense Acquisition Regulation (DAR) § 3-807.7(a)). The determination does not obligate competitors to *price* goods based on any cost-driven formula, and it does not mean that bidders may not actually compete over price (among other factors), as the record overwhelmingly establishes they did here.

7

Nor did this determination convert what the Board correctly found to be a "competitively negotiated procurement," *United Techs. Corp.*, ASBCA No. 51410, 04-1 BCA ¶ 32,556, at 161,009, 2004 ASBCA LEXIS 15 (Finding 1) (*Initial ASBCA Decision*), into a *cost-plus* procurement—where contractors are guaranteed "the cost of the[ir] parts plus a fixed profit," RE433 at 32445 (Remand Decision). As the Defense Department's own audit manual explains, "TINA addresses only the *submission* of cost or pricing data. It does not require a contractor *to use* such data in preparing its proposals or for there to be *a relationship* between the proposals and the conclusions that can be drawn from such data." RE446-1 at 38068 (DX44) (emphasis added); *see also United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) ("no case or regulation" obligates contractors to *use* cost data submitted under TINA in negotiating price). The government argues from the outset (at 1) that Pratt's prices were required to be its "expected costs plus a reasonable profit," but it eventually admits (at 37) that the procurement in this case was *not* a "cost-plus" procurement—a fact that seriously, if not fatally, undercuts its "regulatory structure" argument.

The sole regulation discussed (at 30) by the government also does not support its argument. It simply explains that the "purpose of DD Form 633"— submitted with cost or pricing data—is to provide the government with "estimates and/or incurred costs by contract line item with supporting information ... suitable

for detailed analysis." 32 C.F.R. § 16-206.1(b) (1983). It does not require those estimates or incurred costs to be incorporated into any pricing formula. On Pratt's DD Form 633 for the full-award prices, for example, Pratt provided only the total full-award price—and no cost estimate at all. RE441-13 at 33316 (DX 154).

Instead of setting a pricing formula or ceiling, the governing regulations called for the Air Force to analyze the competitors' prices based on, among other things, current "price quotations," "prior quotations and contract prices," and the government's "independently developed" cost estimates. RE441-5 at 32545 (DAR § 3-807.2(a)). And the Air Force used those same techniques in the FEC. *See* RE446-4 at 38288 (DX124) (GE's prices); RE330 at 23389:3-23391:17 (Transcript) (historical prices); RE446-3 at 38131 (DX54) (independent estimate).

The government's reliance (at 29) on cases in which Congress chose to set prices through hard caps (*Commodities Trading Corp.*) or rigid formulas (*United States v. Cartwright*, 411 U.S. 546, 552 (1973)) is misplaced precisely *because* of the fundamentally different regulatory framework underlying the procurement at issue. Here, Air Force regulations explicitly embraced reliance on competitors' prices, prior contract prices, and the Air Force's independent estimate. RE441-5 at 32545 (DAR § 3-807.2(a)). Far from displacing a "fair market value" approach, those benchmarks are typically used to ascertain fair market value.

2.    *Comparable sales.*

The government's attempt (at 32-33, 38-41) to avoid a comparable-sales analysis is likewise unavailing.  The government concedes (at 39) that "[a] 'comparable sales' analysis has long been and remains the preferred method of establishing a property's 'fair market value.'"  *United States v. 103.38 Acres of Land*, 660 F.2d 208, 211 (6th Cir. 1981).  But the government claims (at 32) that such an analysis would have been impossible here because GE's contemporaneous sales involved engines that were "physically distinct and involved different parts."

That argument is obviously wrong.  The question is whether the engines are comparable, not whether they are identical.  *See id.* at 211 (comparability "'does not mean identity, [but] similarity in many respects'" (citation omitted)); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 239 (5th Cir. 1984) (sales with "some different characteristics must be considered").  GE's and Pratt's engines met the same performance requirements, competed for the same contract awards, and propelled the same jets.  Of course they were comparable.

Nor does GE's purported "late entry into the market" preclude a comparable-sales analysis.  US Br. 32.  Comparable-sales analysis entails a property-to-property comparison.  *See McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 615-16 (Fed. Cl. 2013); *United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979).  A producer's market-entry costs are irrelevant

to whether its *products* are amenable to a comparable-sales analysis. The fact that a home was constructed by a builder new to the area or building its first home, for example, would not disqualify the home from a comparable-sales analysis. In any event, there is no evidence that GE faced market-entry costs that Pratt did not. Both companies were already in the market of supplying military jet engines, and both were producing new generations of prior engines for the FEC. *See* RE446-5 at 38363-64 (DX628); RE441-4 at 32527-28 (DX19).

The District Court never found, as the government contends, that the GE and Pratt engines were in fact not comparable. The phrase "no comparable sales," which the government purports to quote (at 40), appears nowhere in the District Court's opinion. Rather, the court accepted the government's argument that the comparable-sales approach was inappropriate *as a matter of law* because fighter-jet engines are "'seldom if ever sold in the open market'" and Pratt had not proven "what [its engines] might fetch" if they were. RE433 at 32445 (Remand Decision) (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 30 (1984)); *see also* RE429 at 32383 (US Response on Damages). That was error.

Indeed, *50 Acres of Land* confirms that market-based measures, like comparable sales, ordinarily *do* apply in valuing property. *See* 469 U.S. at 29; UTC Br. 27. The District Court's use of "open market" was misplaced. There is no "open market" requirement for using comparable sales, whatever the District

11

Court meant by that term.  The central question is whether a "fair market value" may be ascertained using comparable sales, historical prices, or other benchmarks. *See id.*  Here, there is no reason—including the regulatory structure of the market—that such a value cannot be determined for the engines at issue.

### 3.    *Supposed taint.*

Finally, the government argues that a market-based analysis is impossible because (the government hypothesizes) one can *never* remove the taint from the initial false statements.  *See, e.g.*, US Br. 33-35, 41-46; *cf. id.* at 35  (applying a true fair-market-value analysis "would let [Pratt] retain the very ill-gotten gains the regulatory system was designed to avoid").  That argument fails too.

The argument rests on the flawed proposition that false statements irrevocably taint negotiations, so courts must *presume* that the government is harmed dollar-for-dollar by misstatements about estimated costs—and would have received all subsequent price reductions—unless the contractor proves otherwise. *See United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1333 (4th Cir. 1989); RE433 at 32446 (Remand Decision) ("The Court presumes that the amount overpaid is equal to the fraudulent amount quoted, absent evidence to rebut that.  United Technologies has presented no evidence to rebut the presumption.").  The government unsuccessfully pressed for the *Singer* presumption in the prior appeal.  US 2009 Br. 24, 30-34, 39; US 2009 Reply Br. 6-

7, 28-29, 38, 45, 48. Here the government is less vocal in championing *Singer*, *cf.* US Br. 43 (relying on *Singer*), but it asks the Court to take the same path.

Most obviously, this line of argument is inconsistent with this Court's prior opinion, which adopted a "fair market value" approach instead of *Singer*'s presumption-based and subjective, negotiation-focused approach. Moreover, *Singer* itself recognizes that the "premise upon which [its] presumption operates is that fraudulent inflation of cost proposals fundamentally distorts the negotiation process for *a sole-source contract*." 889 F.2d at 1333 (emphasis added). This case does not involve a sole-source contract. Any support for the presumption collapses where, as here, more than one party is bidding for the contract.

The underlying false statements in this case were made only in connection with the 1983 offer in a failed effort to avoid a split award. The government never paid the prices in that offer. UTC Br. 9.[1] And it never even requested further cost estimates during the ensuing six years while Pratt and GE went at "each other's throats," RE441-2 at 32489 (DX4), competing for engine orders. Instead, the

---

[1] The government suggests (at 14 n.8) that the chart on page 9 of Pratt's opening brief is misleading because it "assumes the warranty liability cap was meaningless." Not so. Whatever the effect of the liability cap, its imposition (noted in the first sentence below the chart) does not change the fact that the government paid substantially less than the 1983 offer prices. The government also faults Pratt for including the warranty discounts at all. But the Court has twice rejected the government's position that the warranty discounts do not count—first, in its decision, then in denying the government's petition for rehearing.

competitors improved their offers and made bottom-line price discounts, untethered to any cost estimates.  RE397 at 30915 (Initial Decision).

The Air Force relied on that competition in evaluating and accepting the new prices and terms.  *Initial ASBCA Decision*, 04-1 BCA at 161,025-26 (Conclusion of Law V); *United Techs. Corp.*, ASBCA No. 51410, 05-1 BCA ¶ 32,860, at 162,813, 2005 ASBCA LEXIS 10 (*ASBCA Reconsideration Decision*) (prices were considered "fair and reasonable" based on the "market test between the competitors").  The District Court (unlike the Board) found that the Air Force also relied on Pratt's description of its cost estimates, but it did not deny that the Fighter Engine Competition was just that—competitive.  No one contends that *GE*'s offers were fraudulent.  Yet Pratt beat them out.  626 F.3d at 317-18.

Especially against that backdrop, the argument that one could never determine the market value of Pratt's engines defies credulity.

## C. The Government Has Failed To Meet Its Burden To Prove Damages Under The Methodology Mandated By This Court

The government argues (at 38-39) that, even under an "ordinary" fair-market-value analysis, the District Court was correct to adopt Zacheretti's damages calculation.  That argument should be rejected.

     *1.*    *Zacheretti's damages calculation was not based on fair market value.*

Fair market value is an objective standard. *United States v. Abbey*, 560 F.3d 513, 523 (6th Cir. 2009) ("The term 'fair market value' means 'objective' and [the] argument that the standard is subjective is thus foreclosed."). "The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities …." *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325 (2013). Accordingly, fair market value is usually proved by "appraisers [using] universally accepted and applied appraisal theories and practices." *United States v. 0.376 Acres of Land*, 838 F.2d 819, 827 (6th Cir. 1988) (Krupansky, J., concurring).

Zacheretti is an auditor, not an appraiser. RE363 at 28171:19-24 (Transcript). He never purported to undertake any sort of appraisal. Not once in his six days of testimony or his 455-page expert report did he utter the term "fair market value." And until this Court set a "fair market value" damages standard, the government never claimed that is what he did either—not in its 300-page proposed findings of fact and conclusions of law, not in its *Daubert* defense of Zacheretti's testimony, and not in its prior briefing before this Court.

Rather, as the government itself explains (at 31), Zacheretti sought to "determine the prices that Pratt would have charged had it played by the rules instead of engaging in fraud." *See also* US Br. 32-33 ("[T]he proper question was what *Pratt* would have charged for *Pratt*'s engines …." (emphasis in original)). In

other words, instead of a market-based appraisal, Zacheretti made a *subjective* determination of what Pratt would have done differently if it had not made the false statements. That is the antithesis of an objective, fair-market-value analysis.

The government argues (at 38-39) that this hypothetical re-engineering of what Pratt would have done is akin to a cost-based measure of fair market value. Far from it. Even when appropriately applied, cost-based measures are used to objectively determine the replacement cost of a good. That method of valuation is "comprehensive," including the costs of "material, labor, overhead, developer's profit, and entrepreneurial incentive … required to either reproduce or replace the subject property." Robert Reilly & Manoj Dandekar, *Complexities Involved in Valuing Tangible Personal Property*, 4 Valuation Strategies 36, 39 (2001).

Zacheretti never considered any actual costs. His analysis began and ended with one category of Pratt's 1983 cost *estimates* for an engine it had never built. Through his markup factors, he purported to translate his adjustments to Pratt's material costs estimates into what Pratt's 1985-90 prices would have been. But he did not evaluate any other category of cost estimates—not labor, overhead, or the like. RE343 at 24453:20-24454:13 (Transcript). He did not even independently evaluate the material cost estimates. As he testified, "I was only making calculations based on the allegations in the complaint solely." *Id.* at 24451:19-21.

16

The Air Force's contemporaneous estimate of reasonable prices for Pratt's engines underscores the flaws with Zacheretti's approach. To evaluate Pratt's offered prices, the Air Force performed its own "independent, objective, unbiased estimate" of reasonable prices for Pratt's engines. RE446-2 at 38091 (DX48); *see Initial ASBCA Decision*, 04-1 BCA at 161,010-11 (Findings 10-11); RE443-1 at 35705-06 (DX131). The Air Force appraisal estimated reasonable engine prices "significantly" *above* Pratt's prices for every year of the competition. *Initial ASBCA Decision*, 04-1 BCA at 161,012 (Finding 18).

The government claims (at 33 n.12) that this independent estimate "was based on Pratt's inflated cost information." Not true. The Air Force completed its estimate before the government even received Pratt's 1983 offer and cost estimates. RE369 at 29232:11-25 (Transcript). The Air Force considered "Pratt engine cost data from previous AF engine buys" that no one contends were inflated. *Initial ASBCA Decision*, 04-1 BCA at 161,011 (Finding 11). And the Air Force cross-checked its price estimate with additional analyses also based on data independent of Pratt's 1983 cost estimates. RE443-1 at 35435, 35441 (DX131); RE369 at 29223:11-2924:2, 29231:6-21 (Transcript) (historical negotiated engine prices; Rand engine database and model). The government objects (at 33 n.12) that the "estimate added in a 25% 'cushion' for part of the engine," but the Air

Force's own pricing experts made that adjustment to account for the fact that part of the engine was entirely new. *See* RE443-1 at 35714 (DX131).

Remarkably, Zacheretti did not consider this independent estimate. RE343 at 24451:22-24452:1 (Transcript). But that is because he was not calculating the fair market value of the engines. As the government puts it (at 47-48), Zacheretti never intended to determine "anything more than the amount by which Pratt's final prices were increased by Pratt's fraudulent cost estimates."

>    2.    *The government offered no evidence of the fair market value of Pratt's warranties.*

The government has failed for the reasons discussed to prove damages under the market-based approach ordered by this Court, regardless of the amount by which the changes to Pratt's warranties actually changed the total value of the fighter-engine contract. In any event, the government also fails to resuscitate the District Court's treatment of Pratt's warranties on remand. UTC Br. 31-34.

To begin with, the government fails to account for the jarring contradiction between the District Court's recognition that the warranties were sold in a competitive market, and its position that the engines they covered were not. RE433 at 32452 (Remand Decision). If a competitive market existed for the warranties (as it did), then surely it must have for the engines too (as it did).

Moreover, this Court instructed the District Court to consider the "fair market value of the fighter jet engine contract" *as a whole*—and for good reason.

18

626 F.3d at 322. Pratt's engines and warranties were sold as a package. The Air Force was required to buy a warranty for every engine, and the only source of warranties for Pratt's engines was Pratt itself. UTC Br. 33. It is a fiction to derive an isolated fair market value of the warranties alone based just on their nominal, list price. For confirmation, one need look no further than the government's own contemporaneous acknowledgements that the warranties by themselves were worth more than it was paying for them. RE441-35 at 34833 (DX345) ("[T]he value of the Warranty provision now [exceeds] the cost of warranty …."); UTC Br. 33-34.

It makes no difference that, as the government argues (at 49-50), the warranties "were not free" and Pratt listed their prices separately. Pratt has not argued that the warranties lacked a nominal price. Rather, Pratt's argument is that, because the warranties were purchased with—and only with—Pratt's engines, their nominal price is not sufficient proof of their fair market value. No rational buyer would evaluate the warranty price separately from the engine price, and no "willing buyer" could separately pay it in any event.

The government attempts to shift the burden to Pratt and, going back to its subjective approach, asks whether "Pratt truthfully thought its warranty prices had a negative expected value." US Br. 50. But the *government* had the burden of proving it paid more than the fair market value of the fighter engine contract—including warranties. Having offered no evidence of the independent fair market

19

value of the warranties, and having previously acknowledged that they were worth more than it paid for them, the government has failed to meet that burden.

The government argues (at 49-50) that Pratt failed to cite evidence below showing that the warranties were worth more than their nominal price, thereby waiving that argument. But Pratt cited the same evidence below that it cites here. RE426 at 32321 (UTC Br. on Damages). There was no waiver.

> 3.    *Because the government has failed to carry its burden of proving damages, it is entitled to none.*

The evidence in the record on fair market value strongly supports the conclusion that the government did *not* pay more than it should have for the engines. UTC Br. 39 (discussing evidence). Indeed, the District Court itself recognized that other buyers likely would have paid considerably more for Pratt's engines than the government did, RE433 at 32446-47 (Remand Decision)—and they *did* (UTC Br. 39).[2] But all that matters here is that the government—which relied solely on Zacheretti's subjective analysis on remand—failed to meet its burden of proving damages under this Court's market-based methodology.

After this Court's decision, the natural thing for the government to do was to seek to put on "fair market value" evidence, such as an appraisal, historical prices,

---

[2] The government claims (at 31 n.11) Pratt wrongly implied that the government made a "profit on [foreign] re-sales." But Pratt's point was simply that foreign buyers willingly paid more for Pratt's engines than the United States did for the engines it did not resell. UTC Br. 39. That evidence is directly relevant to what a willing buyer would pay for the engines, without regard to profit.

or the like.  Pratt itself suggested an "opportunity to present expert testimony on the remanded damages issues, including the fair market value and warranty pricing issues addressed by the Sixth Circuit."  RE414 at 32033 (UTC Statement on Scope of Remand).  But the government opposed that approach—in effect doubling down, even in the face of this Court's decision, on Zacheretti's *non*-market-based analysis of what Pratt would have offered.  *See* RE415 at 32027 (US Statement on Scope of Remand).  That was a risky gambit.  Perhaps it was informed by the ample evidence in the record that the government did *not* pay more than it should have for Pratt's engines.  UTC Br. 39.  But having made it, the government can hardly complain about being held to its burden here.

As courts have in other FCA cases, the Court should hold that the government has failed to prove that it suffered actual damages due to the false statements, *see, e.g.*, *United States v. Advance Tool Co.*, 902 F. Supp. 1011, 1017 (W.D. Mo. 1995); *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (1994), and direct that judgment be entered for Pratt on damages.[3]

---

[3] Even under Zacheretti's approach, Pratt could not be responsible for the $53 million increase in Pratt's prices caused by the *Air Force-mandated* change in the contract's "economic price adjustment" clause.  UTC Br. 36-38.  The government claims (at 46) this argument was waived.  But Pratt made the argument in the same terms below.  RE428 at 32362 (UTC Response on Damages) ("Plaintiff's Alleged Damages Erroneously Include $53 Million that Resulted From the Air Force's Demand for Post-BAFO Changes in Escalation Terms.").

## II.    THE DISTRICT COURT ERRED IN FAILING TO GIVE PRECLUSIVE EFFECT TO THE BOARD'S RELIANCE FINDINGS

On issue preclusion, the government tellingly tries (at 53) to shift the terms of debate by arguing that findings lack preclusive effect unless the issues in the two litigations are literally "identical."  But as Pratt has explained (UTC Br. 46-47), courts—including the Supreme Court—have recognized that issues are "identical" for issue-preclusion purposes where they are "in substance the same," *Montana v. United States*, 440 U.S. 147, 155 (1979), or "sufficiently similar," *Kaufman v. Seidman*, 984 F.2d 182, 185 (6th Cir. 1993); *Friedman v. N.Y. City Admin. for Children's Servs.*, 502 F. App'x 23, 28 (2d Cir. 2012).

In determining whether "issues are sufficiently similar for purposes of issue preclusion," courts consider "whether there is a 'substantial overlap between the evidence or argument … advanced' in both proceedings, whether 'new evidence or argument involve[s] the application of the same rule of law' as applied in the earlier decided action, and the degree to which the claims advanced in both actions are 'closely related.'"  *Syverson v. IBM Corp.,* 472 F.3d 1072, 1080-81 (9th Cir. 2007) (citation omitted); *see Estate of Gaither v. District of Columbia*, 655 F. Supp. 2d 69, 81 (D.D.C. 2009).  Those factors compel a finding of preclusion here.

This litigation and the ASBCA litigation indisputably involved the same body of evidence, including the same witnesses, exhibits, and testimony.  To be sure, the Board's findings focused on Pratt's "cost or pricing data."  But the Board

explained in detail that the Air Force relied on "competitive forces, *rather than* the defective 1983 … cost or pricing data" in validating Pratt's prices and accepting each subsequent price reduction. *ASBCA Reconsideration Decision*, 05-1 BCA at 162,813 (emphasis added). And the Air Force itself readily acknowledged that competition was the "'*sole[]*'" factor in the calculus. *Initial ASBCA Decision*, 04-1 BCA at 161,013 (Finding 30) (citation omitted).

That the Air Force relied on competition to the exclusion of other factors logically compelled—and was thus necessary for—the Board's finding that the Air Force did *not* rely on Pratt's cost or pricing data. *ASBCA Reconsideration Decision*, 05-1 BCA at 162,813; *see Wynne v. United Techs. Corp.*, 463 F.3d 1261, 1264 (Fed. Cir. 2006). The same reliance on competition logically compels the conclusion that the Air Force did not rely on descriptions of that data. *See Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 (1st Cir. 2010) (issue preclusion is "'no[t] limited to ultimate issues: necessary *intermediate* findings can … be used to preclude relitigation'" (citation omitted)).

Because the Board's finding has preclusive effect, the government cannot show that Pratt's misstatements caused it any actual damages, and the government's damages claim fails on that basis alone.

## III.   THE DISTRICT COURT ERRED IN AWARDING DAMAGES AND PREJUDGMENT INTEREST UNDER QUASI-CONTRACT

### A.   Quasi-Contract Is Unavailable Because The Contract Addressed The Subject Matter Of False Statements About Cost

As the government conceded below, "'the existence of a valid and written contract governing a *particular subject matter* precludes recovery in quasi contract for events *concerning the same subject matter.*'"   RE423 at 32233 (US Reply on Common Law Claims) (quoting *Harry W. Applegate, Inc. v. Stature Elec., Inc.*, 275 F.3d 486, 489 (6th Cir. 2001)).  The "subject matter" of this lawsuit—the truth of Pratt's statements in negotiations over the contract—is indisputably the same as the subject matter covered by the contract's Truth In Negotiations Act clause. Indeed, for years the government maintained in this litigation that the TINA clause covered not just the same subject matter as the quasi-contract claims, but the exact same conduct.   RE382 at 30583, 30585 (US Proposed Findings of Fact and Conclusions of Law ¶¶661, 668).

Having lost on its breach-of-contract claim, the government now argues its quasi-contract claims are different—without acknowledging its prior pleadings recognizing the overlap between the claims (*see id.*).   The government fails, however, to identify a single case in which it has recovered on quasi-contract claims based on defective pricing when the underlying contract included a TINA clause.  To Pratt's knowledge, no such case exists.  That is because courts have

24

consistently rejected the government's attempts to supplement its extensive contractual and statutory remedies by resort to quasi-contractual protections, whether in TINA-related cases or otherwise. *See, e.g.*, *United States v. Science Applications Int'l Corp.*, 555 F. Supp. 2d 40, 59-60 (D.D.C. 2008); *United States ex rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1335 n.7 (M.D. Fla. 2003); *United States v. EER Sys. Corp.*, 950 F. Supp. 130, 133 (D. Md. 1996).

*United States v. United Technologies Corp., Sikorsky Aircraft Division*, 51 F. Supp. 2d 167 (D. Conn. 1999), is directly on point. There, the government alleged unjust enrichment and payment by mistake in connection with misrepresentations about costs that fell outside the definition of "cost or pricing data." *See, e.g.*, *id.* at 192 (allegedly misrepresented cost notations "reflected judgments, not facts" and were thus "not cost or pricing data"). But despite the fact that the government's TINA-clause-based claims in connection with those statements therefore failed, the court nevertheless recognized that the existence of the TINA clause barred the government's quasi-contract claims. *Id.* at 184, 200.

To avoid this precedent, the government reads "subject matter" so narrowly that quasi-contract claims would fail only when a contract *explicitly authorizes* the particular challenged conduct. But as courts have recognized, "[t]he term 'subject matter' is a broad term and arguments that particular items falling into that subject matter are not covered when not specifically named generally cannot be

25

sustained." *Noel v. Fleet Fin., Inc.*, 971 F. Supp. 1102, 1114-15 (E.D. Mich. 1997) (Michigan law); *see* UTC Br. 51-52. The federal appellate decisions cited by the government (at 61, 63) are not to the contrary. *Budget Marketing, Inc. v. Centronics Corp.* did not involve quasi-contract claims. 927 F.2d 421, 426 (8th Cir. 1991). The quasi-contract defendants in *Klein v. Arkoma Production Co.* were not parties to the relevant contracts. 73 F.3d 779, 783, 786 (8th Cir. 1996). And *Suburban Transfer Service, Inc. v. Beech Holdings, Inc.* held that a contract barred the quasi-contract claims, even though the loan at issue differed from that addressed by the contract. 716 F.2d 220, 225-27 (3d Cir. 1983).

### B.    The "Fraud Exception" Does Not Save The Government's Claims

The "fraud exception" (US Br. 64-65) does not salvage the government's quasi-contract claims. As one leading case explains, that exception holds that a fraudulently induced contract will not bar a quasi-contractual remedy because the plaintiff "may timely rescind and seek recovery on the theory of quasi contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). Where, as here, a plaintiff chooses "*not* to rescind the agreement, … however, plaintiff is … limited to recovery of damages on the contract, and may not seek recovery based on an alleged quasi contract." *Id.* (emphasis added).

Moreover, even if the fraud exception *did* authorize revision of discrete contract provisions, it would not apply to the provision at issue here. The clause

the government seeks to supersede—the TINA clause—was *required by Congress* and drafted by the government. *See* 10 U.S.C. § 2306(f) (1982). The TINA clause itself certainly was not a product of the challenged fraud.

Nor is the TINA clause unenforceable on "public policy" grounds. US Br. 65. Congress reasonably chose to protect the underlying data, which includes "'all facts which reasonably can be expected to contribute to sound estimates of future costs.'" *Initial ASBCA Decision*, 04-1 BCA at 161,025. But Congress was also "very concerned with clarifying … that a contractor is not required to provide and certify to data relating to judgments." H.R. Rep. No. 99-1001, at 510 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 6529, 6569. The government now claims (at 62) that statements in a final offer are "far more damaging and important than the problems with its underlying data." But Congress saw things differently, and had good reason to do so. UTC Br. 50-51.

## C.    The Government's Waiver And Clear Statement Arguments Fail

The government's waiver argument (at 58) is unavailing. Pratt argued that the express contract barred the government's quasi-contract claims, *see* RE422 at 32177-80 (UTC Response on Common Law Liability); the TINA clause is just an additional argument in support of that defense, *see Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992). Moreover, given that the government had pursued breach-of-contract claims under the TINA clause for 12 years based on the same

statements, it was clear which provision of the contract most directly barred the quasi-contract claims—as the District Court's explicit consideration of the TINA clause underscores.  RE425 at 32292 (Quasi-Contract and Preclusion Order).

The government's "clear statement" argument (at 59) also fails.  The government conceded below that the rule of *Harry W. Applegate* applies to the government.  *See* RE423 at 32233 (US Reply on Common Law Claims); *see also United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 609 (8th Cir. 1999) (applying rule to government claims).  For the first time, the government argues that a clear statutory statement is necessary to foreclose the government's common law right to recovery.  US Br. 59.  That argument fails.  Pratt does not seek to impose statutory limits on the government's common law cause of action, as in the cases the government cites.  *See id.*  Instead, Pratt argues that, under the common law rule of *Harry W. Applegate* itself, the government is not entitled to relief.  The government's statutory clear statement rule is inapplicable on that.

### D.     The Government Is Not Entitled To Prejudgment Interest

The government (at 68) cites cases outside the TINA context to argue prejudgment interest is owed.  But those cases have no application where, as here, the parties expressly agreed that prejudgment interest would only run once the government provided certain forms of written notice.  The government contracting case law makes clear that the government's prejudgment-interest claim fails.

28

In *North American Corp.*, ASBCA No. 28140, 84-2 BCA ¶ 17,286, 1984 ASBCA LEXIS 603, the Board held that government recovery on a quasi-contract payment by mistake claim is payable "under the contract" and therefore subject to the contract's interest provision.  *See id.* at *9 (citing *United States v. Wurts*, 303 U.S. 414 (1938), and other payment-by-mistake cases); *Foreman Indus., Inc.*, No. 23948, 80-2 BCA ¶ 14,501, 1980 ASBCA LEXIS 336, at *14 (remanding for calculation under interest clause in quasi-contract case).   While the Board's repeated resolution of the question is not binding here, "the Board's expertise in interpreting government contracts" is nevertheless entitled to respect.  *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1356 (Fed. Cir. 2007).   The government implies (at 66-67) that *North American Corp.* did not involve a quasi-contract claim, quoting the Board's observation that the refund demand was made "pursuant to" the contract.  That is incorrect.  The very reason that the government was obliged to resort to quasi-contract was that the contract there did not itself authorize recovery of overpayments.

The government argues (at 68) that the rule it advanced in *North American Co.* and *Foreman Industries* cannot be right because the contracting officer could never demand payment to trigger the interest clause.  Not so.  The provision cited by the government states that an "agency head" may not "settle, compromise, pay, or otherwise adjust any claim involving fraud."  41 U.S.C. § 605(a) (1982).  But

the question here is only whether a contracting officer can make a "written demand" for payment. Of course he can. *See Daff v. United States*, 31 Fed. Cl. 682, 688 (1994) (holding that §605(a) "does not limit the [contracting officer's] right to … issue affirmative government claims"). The problem for the government on prejudgment interest is that he did not do so here.

## CONCLUSION

The judgment of the District Court should be reversed.

Respectfully submitted,

s/ Gregory G. Garre

Jeffrey A. Hall
BARTLIT BECK HERMAN
   PALENCHAR & SCOTT LLP
54 W. Hubbard Street
Chicago, IL  60610
(312) 494-4400

David Z. Bodenheimer
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 624-250

Lori Alvino McGill
QUINN EMANUEL URQUHART
   & SULLIVAN LLP
777 Sixth Street, NW, 11th Floor
Washington, DC  20001
(202) 538-8210

Gregory G. Garre
   *Counsel of Record*
Edward J. Shapiro
Jonathan Y. Ellis*
Benjamin W. Snyder*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2207
gregory.garre@lw.com

*Not licensed to practice in the District of Columbia.  All work supervised by a member of the D.C. Bar.

May 15, 2014

30

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Sixth Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point Times New Roman font.

Dated: May 15, 2014

s/ Gregory G. Garre
Gregory G. Garre

## CERTIFICATE OF SERVICE

I, Gregory G. Garre, hereby certify that I have this 15th day of May, 2014, electronically filed the foregoing Reply Brief with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. Participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

s/ Gregory G. Garre
Gregory G. Garre